The HYMAN COMPANIES, INC.

v.

Michael E. BROZOST, Individually, Erwin Pearl, Inc., Erwin Pearl, Inc. Premium Sale, Erwin Pearl Retail, and Kuzmann Chain Co.

No. Civ.A. 97–0269.

United States District Court, E.D. Pennsylvania.

Nov. 7, 2000.

Sandor Engel, Hyman, Engel, Wiener and Bergstein, Allentown, PA, for plaintiff.

Joseph Wolfson, Stevens & Lee, Reading, PA, for defendants.

## DECISION

JOYNER, District Judge.

This case has come before the Court upon motion of the parties for permanent injunction. In March, 1997, the plaintiff's motion for preliminary injunction was granted in part by the late Honorable Robert S. Gawthrop, III and Defendant Michael Brozost was enjoined from representing Erwin Pearl, Inc. and its affiliated companies with regard to lease negotiations and from disclosing any information acquired during his employment with the Hyman Companies regarding its leases, its future plans and the profitability of its stores. The parties have now submitted this case for permanent injunction on the basis of the proceedings before Judge Gawthrop, and the defendants' responses to the plaintiff's Requests for Admissions and Requests for Production of Documents. In addition, the parties have stipulated to certain facts. The matter is therefore now ripe for final disposition and we hereby make the following:

## FINDINGS OF FACT

1. Plaintiff is the Hyman Companies, Inc., a Delaware corporation with its principal place of business in Allentown, Pennsylvania. The Hyman Companies is the owner and operator of a forty-two-store chain of high-end costume jewelry stores located throughout the United States.

2. Nat Hyman is the President and owner of the Hyman Companies, Inc.

3. Defendant Michael Brozost is an attorney-at-law admitted to the practice of law before the Bars of New York and Washington, D.C. and currently resides in Jupiter, Florida.

4. Defendant Erwin Pearl, Inc. is a New York corporation with its principal administrative place of business located at 389 Fifth Avenue, New York, NY. Erwin Pearl, Inc. also maintains places of business at 33 Plan Way, Warwick, RI and 677 Fifth Avenue, New York, NY. Erwin Pearl, Inc. is the parent company of a number of other companies, including Erwin Pearl Inc. Premium Sales, Erwin Pearl Retail, Fernando Originals, Ltd. and the Kuzmann Chain Company.

5. Erwin Pearl, Inc. (hereafter "Pearl") designs, manufactures and sells individually designed costume and fine jewelry in both fine department stores and through its own boutique stores and kiosks throughout the United States, including several airports, and in Israel. Although it has been in the costume jewelry business for twenty-three years, Pearl has only been selling costume jewelry through its own independent retail stores in the last two years and now has seventy such locations.

6. The Hyman Companies, Inc. (hereafter "Hyman") neither manufactures nor designs its own jewelry but rather purchases it from outside manufacturers. Since 1987 when it opened its first store, Hyman has always sold this jewelry through its own retail outlets located primarily in finer malls, airports, hotels, office buildings and casinos.

7. Both Pearl and Hyman target their marketing efforts toward affluent customers and therefore often compete for space in hotels, high-end shopping malls, office buildings and casinos.

8. Between October, 1993 and January, 1997, Mr. Brozost was employed by the Hyman Companies, first as General Counsel and later as Vice–President and General Counsel. Prior to joining Hyman, Mr. Brozost had some twenty-five years of experience as a practicing real estate attorney, having previously worked for Southern Railway, J.C. Penney Company and the Goodman Company. Mr. Brozost was the only counsel employed by Hyman.

9. In his capacity as counsel for Hyman, Mr. Brozost handled all legal matters arising out of Hyman's business operations, including employment, insurance, billing, collections, and copyright issues. Much of his time was spent conducting site inspections, lease negotiations and administration and in coordinating efforts with real estate consultants. In this position, Mr. Brozost also developed relationships with landlords, developers, and casino and hotel operators.

10. Mr. Brozost had contact on an almost-daily basis with Nat Hyman regarding, among other issues, employment and benefit matters, leasing, the profitability of individual stores and which regions and stores were most profitable, Hyman's general criteria for selecting store locations and how these criteria applied to specific locations, new ideas for store design, lighting and siting, potential expansion opportunities, including which stores might be purchased from other store owners and which stores Hyman might be willing to sell, arguments for why developers should choose to rent to Hyman as opposed to its competitors, specific criteria for the hiring of new employees and Hyman's future plans. In addition, Mr. Brozost had access to and was given, when needed, financial information on the profitability of many of the individual Hyman stores, including the actual profit and loss statements. The only information to which Mr. Brozost did not have access was the salary of other company executives.

11. Sometime in 1994, Mr. Brozost met with Mr. Erwin Pearl at Mr. Hyman's request in an endeavor to see if Hyman and Pearl could reach an agreement regarding certain store locations then being held by the newly-bankrupted Ciro Jewelers. Although Mr. Pearl declined to dis-

cuss an agreement, Mr. Brozost thereafter contacted him every few months at Mr. Hyman's suggestion and always for the purpose of determining whether or not he was interested in selling any of his store locations. Mr. Pearl was impressed with Mr. Brozost's tenacity and offered him a job.

12. In the early part of December, 1996, Mr. Brozost met twice with Mr. Pearl in New York, at which time he advised him that he was unhappy with his position at Hyman and was potentially seeking other employment. In the course of these meetings, Mr. Brozost disclosed to Mr. Pearl the identities of the insurance and computer companies Hyman used. The identity of the computer company was particularly of value to Hyman in that it took Hyman a number of years and a lengthy period of trial and error before it could find one that could tailor a program to fit its needs. While in New York, Mr. Brozost also met, on behalf of Hyman, with a real estate consultant with regard to the possible retention of that consultant by Hyman.

13. On or about December 31, 1996, Mr. Brozost and Mr. Pearl came to terms on an employment relationship. On that same date, Mr. Brozost met with Mr. Hyman at the Hyman office in Florida and the parties discussed potential new store sites on the west coast of Florida, Canada and Hawaii and on the retention of a real estate consultant in Hawaii. The meeting lasted approximately two hours and Mr. Brozost did not inform Mr. Hyman that he intended to accept Mr. Pearl's job offer.

14. On Monday, January 6, 1997, Mr. Brozost informed Mr. Hyman that he would be leaving his employ. In a subsequent telephone conversation that same day and in response to Mr. Hyman's inquiry, Mr. Brozost acknowledged that he would be leaving Hyman to take a job with Pearl.

15. Mr. Brozost continued to work for Hyman for the remainder of that week, preparing an outline of matters that he was currently working on, reviewing those matters with Cindy Katz, another Hyman employee with a legal background, resolving some issues involving payables due under various leases and concluding the sale of a few stores.

16. On Monday, January 13, 1997, Mr. Brozost was at the Hyman office in Florida continuing to transition work to Ms. Katz when he received a telephone call from Hyman's attorney advising him that his services were no longer needed and that he should leave the office immediately. Mr. Brozost left the office, taking with him some lease addendum books which he had written in his prior position, some lease forms which he had drafted and his father's probate papers. No one at Hyman had any objection to his taking these items with him.

17. Although Mr. Brozost has no documents or memoranda relating to his employment with the Hyman Companies and has no financial information relating to the plaintiff, he was and is well aware of where Hyman presently has its stores and when those leases are due to expire, what the terms and conditions of those leases are, the tenor of certain negotiations for extensions of various leases, which stores and which regions have proven to be profitable and what Mr. Hyman's plans and ideas were for the future.

18. During his employment with the Hyman Companies, Mr. Brozost, on behalf of Hyman, engaged in lease negotiations for the following mall locations: the Natick Mall in Natick, MA, Bridgewater Commons in Bridgewater, NJ, Watertower Place in Chicago, IL and the Dallas Galleria, in Dallas, TX.

19. Mr. Brozost's job duties and responsibilities with Pearl are the same as his job duties and responsibilities had been with Hyman.

20. All of the aforesaid mall locations, except the Dallas Galleria store, were in operation on January 6, 1997 when Brozost

left the employ of Hyman and began working for Pearl.

21. Subsequent to Mr. Brozost's employment by Pearl, Hyman opened a store at the Dallas Galleria on June 13, 1997.

22. Subsequent to Mr. Brozost's employment by Pearl, Pearl has opened stores at the following mall locations: Bridgewater Commons in Bridgewater, NJ, Watertower Place in Chicago, IL, and in the Dallas Galleria in Dallas, TX.

23. Subsequent to Mr. Brozost's employment by Pearl, he negotiated with the Natick Mall in Natick, Massachusetts on behalf of Pearl for retail space.

### Discussion

By this motion, Plaintiff seeks to make the preliminary injunction issued by Judge Gawthrop in 1997 permanent and to expand its scope to further prohibit Michael Brozost from negotiating for rental space on behalf of Pearl at any of the same malls or other locations at which he had negotiated leases on behalf of Hyman. Again, Plaintiff argues that the defendants should be permanently enjoined from disclosing and using the trade secrets and confidential information which Brozost gleaned from his employment with Hyman as this constitutes a breach of the fiduciary duty which he owed to Hyman as its former attorney. Defendants, in turn, argue that Plaintiff's request for a permanent injunction must be denied because it has failed to establish that Brozost has in the past three years breached or will in the future breach his ethical or fiduciary duties to Hyman and because it has not shown that Brozost has possession of any of the plaintiff's trade secrets that he will inevitably use against it.

■ A district court deciding whether a permanent injunction should be issued must undertake a three stage inquiry. Specifically, the court must decide (1) whether plaintiffs have actually succeeded on the merits of their claim; (2) whether the "balance of equities" favors the granting of injunctive relief; and (3) what form the injunctive remedy should take. *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057 (E.D.Pa.1981). Among the factors considered in undertaking this inquiry are: the adequacy of another remedy; the benefit to the plaintiff if injunctive relief is granted and hardship if such relief is denied; the hardship on the defendant if injunctive relief is granted; the hardship on third parties; the convenience and effectiveness of administration; and the public and social consequences of either granting or denying injunctive relief. *Id.*, citing J. Moore, *7 Moore's Federal Practice*, § 6518(3) (1980).

■ Moreover, it is fundamental that to obtain an injunction, the activity sought to be enjoined must be actionable. *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992), citing *John G. Bryant, Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 6–7, 369 A.2d 1164, 1166–67 (1977). As the Pennsylvania Supreme Court recognized in *Maritrans*, 602 A.2d at 1283 and as Judge Gawthrop observed at page 8 of his March 12, 1997 Memorandum (granting in part the Plaintiff's Motion for Preliminary Injunction),

"Activity is actionable if it constitutes breach of a duty imposed by statute or by common law. Our common law imposes on attorneys the status of fiduciaries vis-a-vis their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly. Failure to so perform gives rise to a cause of action. It is 'actionable.' Threatened failure to so perform gives rise to a request for injunctive relief to prevent the breach of duty."

*See Also:* Pa.R.P.C.Nos. 1.6, 1.7, 1.8, 1.9.

■ Similarly, to be entitled to an injunction against use or disclosure of information under Pennsylvania law, a plaintiff must show: (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the

conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1255 (3rd Cir.1985).

■■ A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it. *Felmlee v. Lockett,* 466 Pa. 1, 9, 351 A.2d 273, 277 (1976). While the plaintiff bears the burden of establishing the existence of a trade secret, among the factors which a court may consider in determining whether information qualifies as a trade secret include:

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa.Super.1997), citing *inter alia, Tyson Metal Products, Inc. v. McCann,* 376 Pa.Super.

461, 465, 546 A.2d 119, 121 (1988). *See Also: SI Handling,* 753 F.2d at 1256. A trade secret, however, does not include a worker's aptitude, skill, dexterity, manual and mental ability and such other subjective knowledge as he obtains while in the course of his employment. *Id.* Finally, even in the absence of a restrictive covenant, a former employer can enjoin the competitive use of confidential information obtained as a result of the trust and confidence of a former employment. *Maritrans,* 529 Pa. at 262, 602 A.2d at 1287, citing *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 279, 203 A.2d 469, 471 (1964).

In application of the foregoing principles to the case at hand, we find that the parties have not presented any additional evidence to that presented in the preliminary injunction proceedings before Judge Gawthrop aside from the defendant Brozost's responses to the plaintiff's Request for Admissions and Request for Production of Documents and the parties' stipulation to four facts. In reviewing the record of this matter, we now find that, in light of the defendants' admission in the Stipulation of Facts that they have opened stores in several of the same retail outlets as the plaintiff since the issuance of the preliminary injunction, the plaintiff has actually succeeded on the merits of its claim and that the balance of equities favors the grant of a permanent injunction to Hyman. In so doing, we see no reason to disturb the factual findings and legal conclusions reached by Judge Gawthrop in his March 12, 1997 Memorandum and we therefore adopt them for the purposes of our decision here.[1]

---

1. Indeed, we agree that Mr. Brozost acquired significant and detailed information regarding Hyman's operations in the 3½ years that he was employed by Hyman. We further agree that although most of that information was general knowledge, the specific knowledge which Brozost acquired with respect to the lease negotiations which he had undertaken on Hyman's behalf and the profitability of its individual stores is properly classified as confidential and proprietary to Hyman given that there are a limited number of so-called "high-end" retail outlets available and the usual and customary desire of the landlords of such outlets to strictly limit the number of retailers selling the same or substantially the same product.

We do, however, find that in light of the facts to which the parties have stipulated since the preliminary injunction hearings 2 ½ years ago, that the injunction then issued is properly expanded ever so slightly in scope. While the preliminary injunction prohibited Mr. Brozost from representing Erwin Pearl, Inc. or any of its affiliated companies in any lease negotiations for a retail space which the Hyman Companies occupied between October, 1993 and December, 1996 and in which Hyman wished to remain, we believe that the preliminary injunction should be extended to prohibit Brozost from representing Pearl and any of its affiliates in lease negotiations with any landlord for retail space within a mall or other venue where Hyman presently occupies space and desires to continue to occupy space. To be sure, as the defendants have freely acknowledged in the Stipulation of Facts, Pearl has, since the inception of this litigation, now opened stores in several of the same "high-end" malls as Hyman, specifically Bridgewater Commons, Dallas Galleria and Watertower Place and has negotiated for space in the Natick Mall in Natick, Massachusetts. Although this expanded injunction comes too late to prevent Pearl from entering the marketplaces in which it has since leased space, to the extent that Mr. Brozost is still negotiating for space in any of the same malls, airports, hotels, etc. for which he negotiated space while working for Hyman, he is now enjoined from completing these negotiations or from conducting such negotiations in the future. Accordingly, with this amendment, we now enter the following:

### Conclusions of Law

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1332.

2. Defendant Michael Brozost owed a fiduciary duty to Plaintiff, The Hyman Companies by virtue of his employment with and position as the Plaintiff's attorney and his threatened breach of that fiduciary duty is actionable under Pennsylvania law.

3. Defendant Brozost thus had a duty to protect and to not use or disclose Plaintiff Hyman's confidential trade secrets and proprietary information to Hyman's disadvantage.

4. The information to which Brozost was privy during the course of his employment with Hyman regarding Hyman's lease terms, conditions and negotiations and the profitability of Hyman's stores constitute such confidential and proprietary information as to be worthy of protection as a trade secret.

5. The preliminary injunction entered in this matter on March 12, 1997 is properly and hereby made permanent, and as amended in paragraph 2 thereof to further enjoin Michael Brozost from representing Erwin Pearl, Inc. or any company affiliated with Erwin Pearl, Inc. in any lease negotiations with any landlord for retail space within a mall or other venue where Hyman presently occupies space and desires to continue to occupy space and for which he negotiated space during the course of his employment with the Hyman Companies, Inc. In all respects, the preliminary injunction issued by the late Honorable Robert S. Gawthrop, III on March 12, 1997 is hereby made permanent.