[Cite as *State ex rel. Luken v. Corp. for Findlay Market of Cincinnati,* 135 Ohio St.3d 416, 2013-Ohio-1532.]

THE STATE EX REL. LUKEN, APPELLANT AND CROSS-APPELLEE, *v.*

CORPORATION FOR FINDLAY MARKET OF CINCINNATI, APPELLEE AND CROSS-

APPELLANT; THE CITY OF CINCINNATI, APPELLEE.

[Cite as *State ex rel. Luken v. Corp. for Findlay Market of Cincinnati,*

135 Ohio St.3d 416, 2013-Ohio-1532.]

*Public records—Trade secrets of public office not subject to disclosure—R.C.*
*149.43(A)(1)(v) and 1333.61(D)—Public office as commercial landlord—*
*Lease terms as trade secrets.*

(No. 2012-0992—Submitted January 22, 2013—Decided April 24, 2013.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Hamilton County,

No. C-100437, 2012-Ohio-2074.

_____

**Per Curiam.**

**{¶ 1}** This is the appeal and cross-appeal of a public-records mandamus case, filed initially in the First District Court of Appeals for Hamilton County. Relator-appellant/cross-appellee, Kevin P. Luken, seeks records from respondent-appellee, the city of Cincinnati, and respondent-appellee/cross-appellant, Corporation for Findlay Market of Cincinnati. Findlay Market is a public market historically owned and operated by the city until 2004, when the city and the corporation entered into lease and management agreements under which the corporation was to manage the market for the city.

**{¶ 2}** Luken wants unredacted copies of the lease agreements between the corporation and merchants who sublease retail space at the market. Luken has received copies of the leases from the city, but the term and rent provisions have been redacted by the corporation.

**{¶ 3}** The corporation claims that it is a private entity not subject to Ohio's Public Records Act because, first, it is not a public entity under the functional-equivalency test of *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, and, second, because it is not an entity responsible for public records under *State ex rel. Cincinnati Enquirer v. Krings,* 93 Ohio St.3d 654, 758 N.E.2d 1135 (2001). The corporation further argues that even if it were a public entity or responsible for public records, the redacted provisions are trade secrets under R.C. 1333.61 and therefore not public records under R.C. 149.43(A)(1)(v) and *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 732 N.E.2d 373 (2000).

**{¶ 4}** Even were the corporation a public entity or an entity responsible for public records, the redacted portions of the record are trade secrets and not public records. Luken has not established that he is entitled to the unredacted records, and therefore we affirm.

### Facts

**{¶ 5}** The city of Cincinnati has historically owned and run public markets in various neighborhoods of the city. At one time, the city owned as many as nine such markets. Before 2004, the city had owned and operated Findlay Market and leased market spaces to farmers and other merchants for more than 150 years. Before leasing Findlay Market to the corporation, the city invested substantial amounts of public money to renovate Findlay Market.

**{¶ 6}** In 2000, at the city's request, the corporation was formed to operate and manage Findlay Market "to preserve and promote the historical, traditional and cultural aspects of Findlay Market as a treasured living landmark of the greater Cincinnati community." The corporation is a private, nonprofit corporation, and no member of the board of directors is or was a councilman, mayor, or city employee at the time he or she was on the board. The city has no

direct governing control over the corporation. The trustees at the time of incorporation were not on the payroll of or serving as employees of the city.

**{¶ 7}** The city and the corporation entered into a management agreement that granted the corporation exclusive rights to manage and operate Findlay Market according to the terms of the management agreement. Specifically, according to the agreement, the corporation may establish reasonable rules and regulations in its discretion to operate Findlay Market. Section 6(a) of the agreement provides that the city has assigned its right to contract with subtenants who occupy space in the market:

> The City assigns its rights under existing contracts with subtenants at the Market to [the corporation]. [The corporation] shall enter into license or lease agreements with existing and new subtenants regarding occupying space in the Market and the Market Facilities. [The corporation] shall have the discretion to determine the amounts of consideration to be paid, and the responsibility for collecting these amounts and using the revenues to pay for Market Operations.

The agreement also provides that the city has oversight over the corporation's operation of the market:

> [The corporation] shall maintain a complete set of books and records, in a form and manner approved by the City, showing all revenue collected and all expenditures made in connection with the operation of the Market Facilities along with such supporting data and documents as prescribed by the City. Such books and records shall be kept in such a manner as to make them easily reconcilable

with the reports and forms to be submitted to the City by [the corporation]. The City shall have the right at any time to examine the records, books, data and documents kept by [the corporation] regarding the operation and maintenance of the Market Facilities. [The corporation] shall provide its annual audited financial statement to the City by September 15th of each year. On a quarterly basis, [the corporation] shall deliver to the City a report, in a format acceptable to the City, by no later than the 30th day of the month following the end of each quarter.

{¶ 8} The corporation, under the management agreement, is expected to manage Findlay Market efficiently, but also to promote it "as a catalyst for economic development in the Over-the-Rhine section" of the city. Policy objectives for the management agreement include compliance with various parts of the city's Municipal Code, including those promoting equal employment opportunities, enhancement of the Small Business Enterprise Program, and compliance with the city's living-wage ordinance. Funds for operations are obtained in part from support payments from the city. The city leases the physical market to the corporation for one dollar per year.

{¶ 9} The corporation has discretion in management and operation of Findlay Market; it sets the terms of lease agreements with tenants, including the consideration paid, and has the responsibility to collect the amounts and to use the revenues to pay for operations. Current funding from the city to the corporation for the operation of Findlay Market is approximately 40 to 45 percent of total revenue. However, the city reimburses the corporation for a large part of its operating expenses, including wages and benefits for employees, cost of contractual services including security, taxes, utilities, insurance, preventive

maintenance, accounting and office expenses, approved operating equipment, and other items approved by the city.

{¶ 10} Luken requested various records from the corporation under Ohio's Public Records Act. The corporation declined to provide the records, asserting that it is not subject to the act. However, it directed Luken to request the records from the city.

{¶ 11} Luken then requested that the city obtain the documents on his behalf. The city provided Luken with the records it had already received from the corporation. Among these records were lease agreements between the corporation and merchants who operate in Findlay Market. But the agreed terms and rents for various spaces at the market had been blacked out, apparently by the corporation, and the city provided the corporation's reasons for the redactions. The corporation stated that the redacted information constituted a trade secret and was therefore within an exception to the Public Records Act.

{¶ 12} Luken filed an original action in mandamus in the First District Court of Appeals. After the parties submitted a stipulated record, that court denied all motions for summary judgment and referred the matter to a magistrate for trial. After trial, the magistrate issued a decision denying the writ. Luken filed objections.

{¶ 13} The court of appeals ruled first that the corporation was not a public institution under *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193. However, the court did hold that the corporation was an entity responsible for public records and therefore subject to the Public Records Act under *State ex rel. Cincinnati Enquirer v. Krings*, 93 Ohio St.3d. 654, 758 N.E.2d 1135 (2001). Finally, the court ruled that the unredacted documents contained trade secrets as defined in R.C. 1333.61(D) that were exempt from disclosure under R.C. 149.43(A)(1)(v). Luken appealed to this court on the issues of whether the corporation is a public institution and whether

the unredacted leases are trade secrets. The corporation cross-appealed the holding that it is an entity responsible for public documents under *Krings*.

{¶ 14} This cause is now before the court for our consideration of the merits.

## Legal Analysis

### *Mandamus*

{¶ 15} "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; R.C. 149.43(C)(1). Although the Public Records Act is accorded liberal construction in favor of access to public records, "the relator must still establish entitlement to the requested extraordinary relief by clear and convincing evidence." *State ex rel. McCaffrey v. Mahoning Cty. Prosecutor's Office*, 133 Ohio St.3d 139, 2012-Ohio-4246, 976 N.E.2d 877, ¶ 16. Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### *Records: Redactions to the lease agreements*

{¶ 16} All the requested documents have been produced by the city to Luken, with the exception of the redactions to the lease agreements between the corporation and various tenants in Findlay Market. Therefore, the ultimate question is whether the contents of the redacted lines on the lease agreements constitute a trade secret and therefore should not be released to Luken by the corporation or the city.

*The terms and amounts of subleases for Findlay Market tenants are trade secrets and thus exempt from public-records law*

**{¶ 17}** The redactions in the records are trade secrets and thus are not public records subject to disclosure. R.C. 149.43(A)(1)(v) excepts from the definition of "public records" "[r]ecords the release of which is prohibited by state or federal law." R.C. 1333.62 allows for an injunction against misappropriation of trade secrets. We have held that a public office's own trade secret, in its possession, is a record "the release of which is prohibited by state or federal law." *State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535, 721 N.E.2d 1044 (2000). "Trade secret" is defined as

> information, including * * * any business information or plans, financial information, or listing of names * * * that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. 1333.61(D). The court has also adopted other factors for analyzing a trade-secret claim:

> "(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.,* by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

(4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information."

*State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 399-400, 732 N.E.2d 373 (2000), quoting *State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-525, 687 N.E.2d 661 (1997), closely paraphrasing 4 Restatement of the Law, Torts, Section 757, comment b (1939).

**{¶ 18}** The entity claiming trade-secret status, in this case the corporation, "bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id.* at 400, citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 181, 707 N.E.2d 853 (1999).

**{¶ 19}** Applying these factors to the facts here, the corporation has satisfied the first part of the *Besser* analysis. The corporation put on an expert who testified that the term and rental rate for subleases in the commercial context are secrets closely guarded by property managers and that knowledge of these items about competitors would be invaluable to property managers. Moreover, if such knowledge became public, it would impair the landlord's ability to get and keep tenants and "create a poisonous environment" among the tenants, who would inevitably compare notes. Disclosure of the information would put the corporation and Findlay Market at a competitive disadvantage.

**{¶ 20}** Thus, the redacted information derives independent economic value from not being generally known or readily ascertainable by others who might obtain economic advantage from knowing the information.

**{¶ 21}** The second factor of the *Besser* analysis is a closer call. On one hand, the corporation keeps the only unredacted copies of the leases in a locked filing cabinet and allows access only to employees who need the information. While the leases do not require tenants to keep the information secret, the corporation's expert testified that most tenants do not divulge the information, because they realize that it is to their benefit not to disclose.

**{¶ 22}** On the other hand, the corporation could have done more to keep the information secret. It has a number of written work policies directed at its employees, for example, on sexual harassment, on conflicts of interest, and on whistleblowers, but not one on keeping lease terms and amounts secret. It does not require that tenants keep the information secret, and apparently some of them have told other vendors their lease terms. For example, the owner of the Taste of Belgium business apparently had knowledge of the rent paid by another tenant. However, the corporation's expert testified that the precautions used by the corporation are standard for commercial property managers. Luken provided no evidence to contradict this testimony.

**{¶ 23}** While the corporation could have taken more care in keeping the information secret, it is within the purview of the court to determine whether or not such measures were adequate: "Applying the statute, a trial court should examine those facts which show the extent to which information is known outside the business and the precautions taken to guard the secrecy of information." *Water Mgt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 86, 472 N.E.2d 715 (1984). The undisputed evidence available on the record indicates that the precautions taken were standard for the industry.

**{¶ 24}** Although it is a close question, the corporation has taken reasonable measures to keep the lease terms a secret under the standard precautions for the industry. Therefore, we hold that the redacted terms are trade secrets under the *Besser* analysis and exempt from public records.

**{¶ 25}** Luken has not established his entitlement to relief in mandamus for the unredacted leases, as they are trade secrets and not public records. Therefore, the question of whether the corporation is a public entity for purposes of public records or an entity responsible for public records cannot affect Luken's entitlement to the unredacted records and is moot. The " 'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more' "—counsels against deciding issues rendered moot by our determination that the redacted information constitutes trade secrets. *State ex rel. Asti v. Ohio Dept. of Youth Servs.*, 107 Ohio St.3d 262, 2005-Ohio-6432, 838 N.E.2d 658, ¶ 34, quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration* (D.C.Cir.2004), 362 F.3d 786, 799 (Roberts, J., concurring in part and in the judgment).

**{¶ 26}** We affirm.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Kevin P. Luken, pro se.

Rendigs, Fry, Kiely & Dennis, L.L.P., Felix J. Gora, and Ann K. Schooley, for appellee and cross-appellant.

John P. Curp, Cincinnati City Solicitor, and Terrance A. Nestor, Assistant Solicitor, for appellee.

_____