*Long v. City of Burlington*, No. 996-11-16 Cncv (Mello, J., Oct. 11, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| MICHAEL LONG, et al.,<br> Plaintiffs<br><br> v.<br><br>CITY OF BURLINGTON, et al.,<br> Defendant | Docket No. 996-11-16 Cncv |

## RULING ON DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

This action stems from the denial of a public records act request. Plaintiffs in this action are several Burlington residents/taxpayers and an advocacy organization, all of whom oppose a proposed development project by BTC Mall Associates, LLC.[1] Plaintiffs have sued the City of Burlington ("the City") and BTC Mall Associates ("BTC"), alleging that the City improperly denied its public records act request for an unredacted market feasibility study related to the mall project (count IV). Now before the Court is BTC's motion to dismiss count IV, and the City's motion for summary judgment on that same count.[2] John L. Franco, Jr., Esq. represents Plaintiffs. Richard W. Haesler, Jr., Esq. represents the City. Brian S. Dunkiel and Jonathan T. Rose, Esqs. represent BTC Mall Associates.

Preliminarily, the court observes that BTC's motion to dismiss is premised on the grounds that it is not a public agency, and therefore is an improper defendant in a public records act case. The court agrees with that analysis. The act provides that "[a]ny person may inspect or copy any public record of a public agency . . . ." 1 V.S.A. § 316(a). "Public agency" or "agency" means "any agency, board, department, commission, committee, branch, instrumentality, or authority of the State . . . ." 1 V.S.A. § 317(a)(2). Plaintiffs do not allege that BTC is a public agency or the

---

[1] It appears that some of the individual plaintiffs have since withdrawn as parties to the action. *See* Notice of Withdrawal of Individual Plaintiffs as Parties in Count IV (July 31, 2017). That fact does not appear to be material to the disposition of the currently pending motions.

[2] In counts I through III, brought against only the City, plaintiffs challenged the November 8, 2016 referendum, where voters had approved a ballot question authorizing the City to borrow $21.83 million to be funded by tax increment financing, and which would help finance street improvements related to the project. Plaintiffs alleged that the City committed several errors in the tax increment financing approval and election process. In a written decision dated May 19, 2017, this court granted the City's motion to dismiss those claims. Therefore, the only remaining issue in the case is the public records act claim (count IV). It bears noting that while it moves to dismiss count IV, BTC also supports the City's motion for summary judgment as to that count.

"functional equivalent" of a public agency. However, plaintiffs maintain that BTC is a necessary party in the event the court determines that the market feasibility study is subject to disclosure and is now held solely by BTC. *See* Pls.' Opp'n at 4 (June 20, 2017). In other words, the party status of BTC is dependent on whether the unredacted market feasibility study is a public record subject to disclosure. The court will first address the City's motion for summary judgment. A ruling for the City on that motion would negate any purpose for BTC's status as a defendant in this case.

Undisputed Material Facts

In December 2014, the Burlington City Council took initial steps toward redevelopment of several downtown city blocks currently housing the Burlington Town Center Mall by approving a process to create a public-private partnership with the property's owners, Devonwood Investors, LLC and BTC Mall Associates, LLC. To provide support and technical assistance, the City contracted with various "experts," including an independent, Seattle-based consulting firm called ECONorthwest, which specializes in economics, finance, and planning. ECONorthwest's services are based on microeconomics analysis. The City's interest in the firm arose from the firm's experience providing economic and technical expertise to state and local governments on economic development projects. The City retained ECONorthwest to help with technical, economic analysis of the project and to assist the City in structuring the public-private partnership.

After the City Council's authorization of the redevelopment process, the City and BTC worked together for 17 months to conceptualize and refine the project, during which the City received technical assistance from ECONorthwest. This process resulted in a Predelopment Agreement ("PDA") memorializing the basic project concept and identifying next steps. The PDA was approved by the City Council.

The PDA included a set of provisions requiring BTC to share certain information related to the economics underlying the project, as well as its financial qualifications to complete the project. That information included "copies of any market studies and feasibility analyses prepared for the benefit of [BTC]'s project lender(s) and/or investors and available to [BTC]." That information was needed to test the assumptions in BTC's economic pro forma, and would necessarily involve disclosure of information that, if disclosed to BTC's competitors, could harm BTC commercially. To satisfy BTC's confidentiality concerns, the parties agreed in the PDA "to cooperate as needed to facilitate the completion of the[] disclosures and assessments, including appropriate treatment of proprietary and confidential information."

In August 2016, BTC and ECONorthwest entered into a non-disclosure agreement ("NDA"). Under the NDA, BTC agreed to provide the confidential business information needed for ECONorthwest to conduct its own assessment of the project, and ECONorthwest agreed that it would not disclose that information to anyone, including the City. The City, through its attorney, acknowledged the terms of the NDA.

BTC then provided ECONorthwest with a copy of its market feasibility study prepared by its own consultants over the summer of 2016. The study included a review of the project's major components in light of current and anticipated market conditions, and concluded that the "project is economically feasible and represents a viable investment for the developer." On September 23,

2016, ECONorthwest issued an independent analysis of the study, which it found to be "generally well conceived" and noted that it was in "agreement with its findings."

BTC also provided a copy of the feasibility study to the City and the public, although all confidential information was redacted, including figures showing estimated rents, revenues, costs, and other proprietary financial information associated with the project. This type of information is treated as confidential in the real estate industry because public disclosure of a developer's pricing, cost, and revenue information can be competitively harmful. Consistent with the NDA, ECONorthwest did not share a full, unredacted copy of the feasibility study with the City.

On October 6, 2016, opponents of the project, including plaintiffs, requested a copy of the unredacted feasibility study and any related documents from the City pursuant to the Vermont Public Records Act. The City denied the request on grounds that (1) it did not have an unredacted copy of the study, and (2) the unredacted study would be exempt from disclosure under the act as a confidential business record. An appeal was denied by the Mayor.

<u>Discussion</u>

The City argues, first, that the unredacted feasibility study is not a public record under the public records act. The court agrees. The act provides that "[a]ny person may inspect or copy any public record of a public agency . . . ." 1 V.S.A. § 316(a). "Public agency" or "agency" means "any agency, board, department, commission, committee, branch, instrumentality, or authority of the State . . . ." 1 V.S.A. § 317(a)(2). "[P]ublic record" or "public document" is defined as "any written or recorded information, regardless of physical form or characteristics, which is produced or acquired in the course of public agency business." 1 V.S.A. § 317(b). Accordingly, documents not so produced or acquired are not subject to mandatory disclosure under the act.

The City did not produce the feasibility study. Instead, it acquired a redacted version of it from BTC, which is a public record and has been available to the public. The unredacted version, however, it not in the City's possession or custody, nor does the City have any legal right to obtain an unredacted copy pursuant to the NDA, which expressly prohibits disclosure of that information to the City. The City never produced nor acquired an unredacted copy of the feasibility study. Thus, it is not a public record subject to disclosure.

Plaintiffs cite to general agency principles to argue that the requested information is subject to disclosure because it was disclosed to an agent of the City pursuant to city business. *See* <u>Carter v. Gugliuzzi</u>, 168 Vt. 48, 54 (1998) (quoting <u>Estate of Sawyer v. Crowell</u>, 151 Vt. 287, 291 (1989)) ("A fundamental tenet of agency law holds that 'the knowledge of an agent acting within the scope of his or her authority is chargeable to the principal, regardless of whether that knowledge is actually communicated.'"); *see also* Restatement (Second) of Agency § 272 (1958). However, plaintiffs cite no authority applying general agency principles in this context. Vermont cases involving alleged public records in possession of private entities have applied the "legal ownership" or "functional equivalence" analyses.[3] *See* <u>Whitaker v. Vermont Information</u>

---

[3] The "functional equivalence" test considers whether a private entity from which records are sought is the "functional equivalent of a public agency," and whether the records sought "are within the scope of that equivalency. <u>Prison Legal News v. Corrections Corp. of America</u>, No. 332-5-13 Wncv, 2014 WL 2565746, *6 (Vt. Super. Jan. 10, 2014) (Bent,

3

<u>Technology Leaders, Inc.</u>, No. 781-12-15 Wncv, 2016 WL 8260068, *2 (Vt. Super. Oct. 28, 2016) (Teachout, J.) (applying "functional equivalence" test to determine whether documents produced and acquired by state contractor were public records); <u>Prison Legal News v. Corrections Corp. of America</u>, No. 332-5-13 Wncv, 2014 WL 2565746, *6 (Vt. Super. Jan. 10, 2014) (Bent, J.) (adopting "functional equivalence" test for assessing public records act claims against private entities, in that case a state prison contractor); <u>Munson Earth Moving Corp v. City of South Burlington</u>, No. S0805-08 CnC, 2009 WL 8019258 (Vt. Super. Mar. 30, 2009) (Pearson, J.) (document in possession of private party "acquired" by public agency only when agency had "legally acquired" the document"). Here, again, the City had no legal right to acquire the unredacted version of the feasibility study.

Even assuming that general agency principles apply here, that would not aid plaintiffs' argument. Plaintiffs have correctly cited the general rule that an agent's knowledge imputes to the principal if the agent is acting within the scope of his authority. However, as the City also accurately observes, that general rule does not apply where the agent is under a separate obligation not to disclose the relevant knowledge to the principal. *See* Restatement (Second) of Agency § 281 (1958) ("A principal is not affected by the knowledge of an agent who is privileged not to disclose or act upon it and who does not disclose or act upon it."); *see also* <u>id</u>., Reporter's Notes ("there is universal agreement to the effect that where an agent's duties to others prevent him from disclosing facts to the principal, the latter is not bound because of the agent's knowledge"). As the most recent Restatement of Agency reaffirms:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent . . . is subject to a duty to another not to disclose the fact to the principal.

Restatement (Third) Of Agency § 5.03 (2006); *see also* <u>id</u>. cmt. e ("when an agent is subject to a duty to another not to disclose a fact to the principal, the agent's knowledge is not imputed to the principal"). Assuming that agency principles apply in the context of a public records act claim and that ECONorthwest was an agent of the City, ECONorthwest's knowledge of the information sought cannot be imputed to the City. The unredacted feasibility study is not a public record.

The City next contends that, even if the redacted feasibility study is a public record under the act, it is subject to the trade secrets exemption. Again, the court agrees. The statute exempts "[t]rade secrets," meaning:

> confidential business records or information, including any formulae, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which a commercial concern makes efforts that are reasonable under the circumstances to keep secret, and which gives

---

J.). If so, the public records act reaches those entities and records. <u>Id</u>. "The non-exclusive factors are: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government." <u>Id</u>.

4

> its user or owner an opportunity to obtain business advantage over
> competitors who do not know it or use it . . . .

1 V.S.A. § 317(c)(9). In considering whether certain information deserves trade secret protection, courts consider whether "the information has independent economic value that is not readily ascertainable to others" and whether "reasonable efforts were made to maintain the information's secrecy." Dicks v. Jensen, 172 Vt. 43, 47 (2001).

BTC clearly made reasonable efforts to maintain the secrecy of the unredacted feasibility study. The unredacted study was shared only with the City's consultant, and only after the negotiation of a non-disclosure agreement between BTC and ECONorthwest prohibiting the consultant from disclosing the study with anyone, including the City, and only after the agreement was acknowledged by the City Attorney. Plainly, this was sufficient.

Plaintiffs contend that these efforts were not reasonabe only because the City Council did not expressly approve the final non-disclosure agreement. But as the City correctly points out, nothing requires a *binding* non-disclosure agreement in these circumstances. The mere fact that BTC shared the redacted information only after negotiating a non-disclosure agreement demonstrates reasonable efforts to maintain its secrecy.[4]

To the extent City Council authorization was required for the City to "acknowledge" the nondisclosure agreement, such authorization was provided by the predevelopment agreement, where the City agreed "to cooperate as needed to facilitate the completion of the[] disclosures and assessments, including appropriate treatment of proprietary and confidential information." The City's acknowledgement of the nondisclosure agreement plainly falls within that authorization to "cooperate as needed . . . ." The court rejects plaintiffs' argument that this provision constitutes an unenforceable "mere agreement to agree." Miller v. Flegenheimer, 2016 VT 125, ¶ 12; *see also* Reynolds v. Sullivan, 136 Vt. 1, 3–4 (1978). As the City notes, the point here is not whether it had an enforceable agreement with BTC, but that the City Council's express approval of that contract *authorized* the City to "acknowledge," or sign onto, the nondisclosure agreement.

Finally, the redacted information here clearly "has independent economic value that is not readily ascertainable to others," Dicks, 172 Vt. at 47, or "gives [BTC] an opportunity to obtain business advantage over competitors who do not know it or use it . . . ." 1 V.S.A. § 317(c)(9); *see also* Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 347 (2002) (recognizing that § 317(c)(9) exemption protects "financial information" that "give[s] the user or owner an opportunity to obtain a business advantage over competitors who do not know or use that information").

The first paragraph of the feasibility study identifies the information upon which it relies: "The financial assessment took into account: Construction and Related Development Costs; Potential Project Revenues based on the market-tested Absorption and Rent projections summarized in the report; Potential Project Operating Costs; and Project Debt Payments based on

---

[4] In any event, it is not clear that any City approval or acknowledgement of the nondisclosure agreement was required. This was an agreement between two private entities who did not need City Council approval to make a binding contract.

project financing model made available by the developer." Ex. C to City's Mot. for Summ. J. (Market Feasibility Assessment) at 4. Plaintiffs contend that it is impossible to tell what information was redacted without an *in camera* review. However, a review of the redacted feasibility study clarifies exactly what information was redacted: projected net operating income and yield on cost, id. at 7; projected rental rates, id. at 13, 45, 61–62, 68; pre-lease rental rates and terms, id. at 61, 67; projected parking fees, id. at 14, 69, 70; and tables indicating detailed construction cost estimates, total project cost estimates, and projections of five-year project returns. Id. at 72–74. Indeed, virtually all of the redactions are , numbers, dollar figures, or tables of dollar figures, where the narrative context makes it crystal clear what those redacted dollar figures represent.

Plaintiffs do not genuinely dispute that information such as estimated rents, revenues, costs, and other proprietary financial information is treated as confidential in the real estate industry because public disclosure of a developer's pricing, cost, and revenue information can be competitively harmful.[5] This fact is also recognized in the case law. *See*, *e.g.*, State v. Corp. for Findlay Mkt., 988 N.E.2d 546, 551 (Ohio 2013) (lease terms and rental rates are trade secrets in the commercial real estate industry, and thus unredacted documents containing that information were not public records subject to disclosure); State ex rel. Luken v. Corp. for Findlay Mkt. of Cincinnati, 972 N.E.2d 607, 614 (Ohio Ct. App. 2012), aff'd sub nom. State v. Corp. for Findlay Mkt., 988 N.E.2d 546 (redacted term and rent provisions of license agreements between lessee/manager of public market on city property and merchants who subleased spaces in the market, were trade secrets, exempt from disclosure under public records act; confidentiality provided competitive advantage and economic benefit); Hyman Companies, Inc. v. Brozost, 119 F. Supp. 2d 499, 505 (E.D. Pa. 2000) "lease terms, conditions and negotiations and the profitability of [plaintiff's] stores constitute such confidential and proprietary information as to be worthy of protection as a trade secret"); BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd., 791 F. Supp. 489, 545 (E.D. Pa. 1992) (recognizing trade secret protection for cost and pricing information of product or service, business plans, marketing strategies, and financial projections, and the terms of specific customer accounts including contract expiration dates and revenues generated). There is no question that the type of information redacted in the feasibility study constitutes a trade secret. Thus, that information is exempt from public disclosure.

Order

The City of Burlington's motion for summary judgment on the public records act claim (count IV) is granted. Accordingly, BTC Mall Associates' motion to dismiss is also granted.

SO ORDERED this 10th day of October, 2017.

_____
Robert A. Mello
Superior Court Judge

---

[5] To the extent plaintiffs purport to dispute this fact, they offer no contradictory evidence, and rely only on their argument discussed (and rejected) above that we don't know what was redacted because it wasn't disclosed. On this record, no reasonable fact-finder could conclude that the type of information redacted is not generally protected as a confidential trade secret in the real estate industry.