NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 103

No. 2017-434

| | |
|---|---|
| Michael Long, Lynn Martin, Steven Goodkind and the Coalition for a Livable City | Supreme Court |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| City of Burlington and BTC Mall Associates, LLC. | April Term, 2018 |

Robert A. Mello, J.

John L. Franco, Jr., Burlington, for Plaintiff-Appellant Coalition for a Livable City.

Richard W. Haesler, Jr. and Justin St. James, Burlington, for Defendant-Appellee City of Burlington.

Jonathan T. Rose and Brian S. Dunkiel of Dunkiel Saunders Elliott Raubvogel & Hand, PLLC, Burlington, for Defendant-Appellee BTC Mall Associates, LLC.


PRESENT:  Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1.    **ROBINSON, J.**   Plaintiff Coalition for a Livable City (CLC) appeals the trial court's summary judgment denying its Public Records Act (PRA) request to the City of Burlington for an unredacted financial feasibility study provided by a private developer to a contractor hired by the City of Burlington to help the City assess the viability of the developer's plans.  The development plans included some public improvements to be financed with tax dollars.  We do not decide whether the documents qualify as public records under the PRA because we conclude that, assuming without deciding that they do, the redacted information falls under the PRA trade-secrets exemption.  Accordingly, we affirm.

¶ 2.    The undisputed facts are as follows.  In December 2014, the Burlington City Council took its first steps toward redevelopment of several downtown city blocks then home to the Burlington Town Center Mall (Project) by approving a process to create a public-private partnership with the property's owners, Devonwood Investors, LLC and BTC Mall Associates, LLC (collectively BTC).  The City contracted with an economic consulting firm called ECONorthwest to help the City analyze the Project and structure a public-private partnership.  ECONorthwest is an independent Seattle-based consulting firm that has experience providing economic and technical expertise to state and local governments on economic redevelopment projects.

¶ 3.    Over the next seventeen months, the City, with technical assistance from ECONorthwest, worked with BTC to conceptualize and refine the Project.  This effort led to a Predevelopment Agreement (PDA) to memorialize the basic Project concept and identify the next steps in bringing it to fruition.  BTC's proposed redevelopment included, among other things, residential, retail, and commercial office components, as well as parking.  The PDA contemplated up to $222 million in public improvements and acquisitions financed by tax increment financing. The City Council approved this PDA in May 2016.

¶ 4.    The PDA included a provision requiring BTC to provide the City with copies of any market studies and feasibility analysis prepared for the benefit of BTC's lenders or investors and available to BTC.  The PDA recited:

> The Parties agree that such reports customarily include data that analyze whether a market exists for the retail, commercial and residential components of a project, and whether the anticipated market demand for the retail, commercial and residential components of a project is sufficient to support the anticipated costs of developing, constructing and operating it.

This provision involved disclosures of information "that if disclosed to BTC's competitors, could harm BTC commercially."  The City sought this information to test the assumptions in BTC's

2

financial projections. The agreement further provided that BTC would work cooperatively with ECONorthwest to provide a range of customary financial underwriting information, and stated, "The parties agree to cooperate as needed to facilitate the completion of these disclosures and assessments, including appropriate treatment of proprietary or confidential information."

¶ 5. In August 2016, BTC and ECONorthwest purported to enter into a nondisclosure agreement (NDA) pursuant to which BTC agreed to provide confidential business information to ECONorthwest so it could do its own assessment of the project, and ECONorthwest agreed that it would not disclose that confidential business information to anyone, including the City. Whether this agreement created any enforceable rights or obligations is disputed.[1]

¶ 6. Soon thereafter, BTC provided ECONorthwest with a copy of a Market Feasibility Assessment (Study) prepared by its own consultants. The Study concluded that the Project was economically feasible and represented a viable investment for the developer. In September 2016, ECONorthwest issued its own analysis of the Study, concluding that the Study was generally well conceived and agreeing with its findings.

¶ 7. BTC provided a redacted copy of the Study to the City and the public. BTC asserts that the redactions include figures showing estimated rents, revenues, costs, and other proprietary financial information associated with the Project. CLC contends that since the unredacted document has not been made available, it has no basis to admit or deny BTC's assertion as to the nature of the redactions. The document itself undisputedly includes the following redactions made by BTC[2]:

_____

[1] CLC contends that only the City Council had legal authority to approve such an agreement, and the City Council neither approved this NDA nor authorized ECONorthwest to enter into it.

[2] The record in dispute actually says "[REDACTED]" where indicated.

[T]he analysis indicates that the project achieves a Net Operating Income of $[REDACTED] million in year 2020, resulting in a Yield on Cost of [REDACTED] percent.

. . . .

As of the time of this writing, monthly rental rates [in the 139 market rate rental units] were projected as following: Efficiencies - $[REDACTED] per month; One Bedroom - $[REDACTED] per month, Two Bedroom - $[REDACTED] per month.

. . . .

. . . Triple Net [retail] leases under negotiation range from $[REDACTED] to $[REDACTED] per square foot.

. . . .

Based on current retail rents in the Church Street Marketplace and the developer's ongoing negotiations with potential commercial tenants in pre-lease negotiations, significant retailers and service providers are expected to lease in the $[REDACTED] - $[REDACTED] PSF NNN range,[3] and the project overall is expected to achieve toward the high end of downtown core retail rates.

. . . .

. . . For pro forma purposes . . . a blended retail lease rate of $[REDACTED] PSF NNN has been assumed.

. . . .

An executed Letter of Intent between the University of Vermont Medical Center and Devonwood Investors LLC commits the Medical Center to lease 110,000 square feet of office space at a triple net rate of $[REDACTED] per square foot. The lease has a [REDACTED]-year term, with two [REDACTED] year options to extend.

Negotiations are underway for an additional 105,000 square feet of office space, at rents of $[REDACTED] NNN.[4]

. . . .

Based upon the negotiated lease and leases under the negotiation and the time that will pass between now and initial office occupancy,

---

[3] PSF stands for "per square foot" and NNN stands for "triple net."

[4] BTC redacted a footnote to this statement in its entirety.

4

the smaller size of remaining office units and the quality of the Class A space, we estimate lease rates [for office space] to range from $[REDACTED] to $[REDACTED] NNN.

. . . .

. . . As of this writing, monthly fees [for on-site parking] are projected at $[REDACTED].

. . . .

The 555 parking spaces rented on monthly leases ($[REDACTED])/Month) will reach full occupancy and demand will remain at a high level.

In addition, various tables were redacted, including "[a] detailed construction cost estimate," a table reflecting loan sources, and tables showing projected five-year returns from the residential, retail, office, and parking components of the Project.

¶ 8.    In October 2016, Lynn Martin, on behalf of CLC, requested a copy of the unredacted Study and related documents from the City pursuant to the PRA.  The Burlington City Attorney denied the request, explaining that: the City did not have an unredacted copy of the document and thus it had no responsive public records; the document was shared with the City's economic consultant, ECONorthwest, pursuant to an NDA that prohibited its disclosure to others; and even if the document were a public record, it would be exempt from disclosure pursuant to 1 V.S.A. §317(c)(9)—the trade-secrets exemption to the PRA.  The Burlington mayor denied CLC's appeal on essentially the same grounds.

¶ 9.    Several individual plaintiffs and CLC filed suit against the City alleging that it violated the PRA by failing to disclose the unredacted Study.[5]  In addition to naming the City, plaintiffs sued BTC claiming if the unredacted study is a public record subject to disclosure, BTC would be a necessary party because only BTC held the record.

---

[5] The plaintiffs' complaint included several other counts unrelated to the PRA that were resolved prior to this public-records claim.   These claims are not at issue in this appeal.

5

¶ 10. Considering the above undisputed facts, the trial court granted the City summary judgment and dismissed the claim against BTC. First, the court reasoned that the study is not a public record under the PRA. See 1 V.S.A. § 317(b) (defining "public record" as "any written or recorded information . . . which is produced or acquired in the course of public agency business"). The court concluded that the City neither produced nor acquired the unredacted Study in the course of public agency business, and it had no legal right to obtain the unredacted copy pursuant to the NDA.

¶ 11. The court rejected the argument that the unredacted Study is a public record because it was disclosed to an agent of the City pursuant to City business. The court questioned the applicability of agency law to the analysis, noting that some trial courts in Vermont have applied a "functional equivalence" test, considering whether the private entity from which records are sought is the "functional equivalent of a public agency" and whether the records sought "are within the scope of that equivalency." The court implicitly concluded that ECONorthwest was not the functional equivalent of the City, emphasizing that, pursuant to the NDA, the City had no legal right to acquire the unredacted version of the Study. Moreover, the court concluded that even if common-law agency principles did apply in this context, an agent's knowledge is not imputed to the principal if the agent is subject to a duty to another not to disclose the fact to the principal. In light of the NDA, ECONorthwest's knowledge of the redacted information cannot, the court reasoned, be imputed to the City.

¶ 12. Second, as an alternate ground, the court concluded that the redacted information was exempt as a trade secret. See 1 V.S.A. § 317(c)(9) (exempting "confidential business records or information . . . which a commercial concern makes efforts that are reasonable under the circumstances to keep secret, and which gives its user or owner an opportunity to obtain business advantage over competitors who do not know it or use it"). The court rejected CLC's claim that it is impossible to tell what information was redacted without the court reviewing the document

6

itself, noting that it is clear on the face of the document exactly what was redacted, and virtually all of the redactions are numbers, dollar figures, or tables of dollar figures where the narrative context makes it crystal clear what those redacted dollar figures represent. It concluded that public disclosure of the redacted information, reflecting BTC's pricing, cost, and revenue information, could be competitively harmful.

¶ 13. Further, noting that BTC shared the unredacted Study only with ECONorthwest, and only after negotiating an NDA that was acknowledged by the City Attorney, the court concluded that BTC had made reasonable efforts under the circumstances to keep the information secret. To the extent that City Council authorization was required for the City to "acknowledge" the NDA, the court concluded that this authorization was provided by the City's agreement in the PDA to cooperate as needed to facilitate disclosures, "including appropriate treatment of proprietary and confidential information." On these bases, the court awarded the City summary judgment on the public records claim and dismissed the claim against BTC.

¶ 14. CLC filed a motion to reconsider asserting that although, pursuant to the City's statement of undisputed facts, the "full, unredacted copy" may not have been shared with the City, much of the redacted information was actually shared in an executive session of the Burlington Finance Board along with many other members of the Burlington City Council. CLC had not previously raised this argument.

¶ 15. The trial court denied the motion. In its ruling, the court considered the effect of this Court's intervening decision in Toensing v. Attorney General, 2017 VT 99, ¶¶ 1, 22, __ Vt. __, 178 A.3d 1000, in which we held that the PRA applies to digital documents stored in private accounts where those documents otherwise meet the definition of public records—that is, they were produced or acquired in the course of public agency business. The trial court reiterated its

7

conclusion that in this case the Study was neither produced nor acquired by the City in the course of agency business. CLC appealed.[6]

¶ 16.  On appeal, CLC emphasizes that the unredacted Study was provided to an agent of the City who acted on the information by validating the Study's findings to the City. Alternatively, it contends that summary judgment is premature because more discovery is needed to find out whether the redacted information actually was shared with the City. Finally, CLC argues that the redacted information is not the type of information that qualifies under the trade-secrets exemption, and that sufficient efforts were not made to ensure the secrecy of the materials.

¶ 17.  On the first point, CLC emphasizes that BTC provided this information to the City's contractor in connection with a proposal that would entail substantial taxpayer financing in order to enable the City to determine the project's viability. It invokes the public significance of the information as part of the basis for denying trade-secret status.

¶ 18.  In the alternative, CLC notes that the City's undisputed evidence does not establish that the City did not actually acquire the redacted information. CLC points to minutes of a September 2016 meeting of the City Board of Finance, posted online, that suggest that in executive session the Board of Finance reviewed privileged and confidential information concerning the BTC redevelopment project, including the feasibility report. CLC argues that the Finance Board's receipt of the redacted information undercuts the City's claim that the unredacted Study is not a public record, and it argues that summary judgment is premature because more discovery is required.

¶ 19.  Finally, with respect to the trade-secrets exemption, CLC argues that this is not the kind of information that qualifies as a trade secret, and BTC did not in any event make sufficient efforts to ensure the secrecy of the materials. It argues that the redacted material does not contain

---

[6] Prior to the court's decision, the individual plaintiffs withdrew pursuant to a settlement agreement.

8

any of BTC's existing trade information; rather, it is an estimation of what retail, commercial, and residential rents future markets will bear. The Study identifies the range, relative to existing rates, in which BTC rental rates will fall (generally, the higher end), but redacts the specific projected rental figures. The assessment of the current range of rental rates in Burlington, which is based on publicly available information and is not redacted, is not uniquely in the possession of BTC, and is not a trade secret. Moreover, CLC argues that once asking rents are actually made known to third parties, they are no longer known only to individuals within a commercial concern and lose their exemption from disclosure.[7] With respect to the construction cost estimates and the return and yield estimates, CLC argues that these all reflect estimates rather than BTC's actual experience, and the City did not prove the information was not otherwise available. With respect to BTC's efforts to ensure the secrecy of the materials, CLC argues that the NDA between ECONorthwest and BTC did not constitute a sufficient effort to ensure the secrecy of the information because the NDA was never approved by the City Council and the PDA approved by the City Council was merely an "agreement to agree."

¶ 20. We review a motion for summary judgment without deference using the same standard as the trial court. In re All Metals Recycling, Inc., 2014 VT 101, ¶ 6, 197 Vt. 481, 107 A.3d 895. "[S]ummary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Bacon v. Lascelles, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996); see V.R.C.P. 56(a).

¶ 21. Applying this standard, we affirm the trial court's judgment on the ground that, assuming without deciding that the unredacted Study is a public record, the redacted information

---

[7] CLC makes an additional argument concerning the redaction of information relating to a letter of intent between the University of Vermont Medical Center (UVMMC) and BTC. It argues that the City did not prove that this information is not otherwise available, and points to an article posted on VTDigger, an online news source, in which UVMMC confirmed that it agreed to pay $22 per square foot to lease 80,000 to 110,000 square feet.

is exempt from disclosure under the PRA pursuant to 1 V.S.A. § 317(c)(9).[8] In understanding the scope of § 317(c)(9), we rely on the plain language of the exemption and our caselaw construing it. Applying this law to the record in this case, we conclude that the redacted information is of the type that may be included within the exemption, and that BTC has made reasonable efforts under the circumstances to keep the information secret.

¶ 22. The public records act exempts from disclosure "trade secrets," which it defines to mean:

> confidential business records or information, including any . . . plan, . . . production data, or compilation of information which is not patented, which a commercial concern makes efforts that are reasonable under the circumstances to keep secret, and which gives its user or owner an opportunity to obtain business advantage over competitors who do not know it or use it . . . .

1 V.S.A. § 317(c)(9).[9] Like any exemption to the disclosure requirements in the PRA, the trade-secrets exemption should be construed strictly against the custodian of records with doubts

_____

[8] We dispense quickly with the City's and BTC's arguments that CLC cannot prosecute this appeal because the unincorporated association has not registered as a business organization with the Secretary of State and is thus precluded from maintaining an action in court. See 11 V.S.A. §§ 1621, 1626. The City raised this defense for the first time in its post-decision opposition to CLC's motion to reconsider. We have held that failure to register pursuant to 11 V.S.A. § 1621 is an affirmative defense that must be raised specifically in a timely manner. See Coty v. Ramsey Assocs., Inc., 149 Vt. 451, 469, 546 A.2d 196, 208 (1988) (declining to consider argument that party lacked standing to sue in name of business because business was not registered pursuant to § 1621 because "it constitutes an affirmative defense which was not raised specifically and in a timely manner"); Senesac v. Duclos 128 Vt. 601, 603, 270 A.2d 156, 158 (1970) (noting that challenge to standing based on failure to register is affirmative defense that should have been pleaded or else it was waived); V.R.C.P. 12(b) (requiring affirmative defenses to be pled in answer except for listed defenses that may be asserted by motion before answer); V.R.C.P. 12(g) (requiring consolidation of defenses in motion, with identified exceptions in Vermont Rule of Civil Procedure 12(h)(2)). We recognize that the City and BTC may have opted against raising the issue sooner because prior to the July 2017 withdrawal of the individual plaintiffs, CLC's status as an additional plaintiff had no practical effect. However, CLC was a named plaintiff from the outset of this litigation, and the City and BTC had ample opportunity to raise the defense. Because this issue has not been preserved, we do not address the merits.

[9] This definition is consistent with the definition of "trade secret" for purposes of Vermont's laws addressing the misappropriation of trade secrets:

resolved in favor of disclosure. <u>Springfield Terminal Ry. v. Agency of Transp.</u>, 174 Vt. 341, 345, 816 A.2d 448, 452 (2002). The burden of establishing that an exemption is applicable is on the agency seeking to avoid disclosure. <u>Id</u>.

¶ 23. This Court previously analyzed the applicability of this exemption to documents disclosing a business's sensitive financial data in <u>Springfield Terminal Railway</u>, 174 Vt. at 341, 816 A.2d at 448. In that case, multiple bidders responded to a request by the Vermont Department of Transportation (VTrans) for proposals to provide rail freight service in the state. After VTrans selected a contractor, a disappointed bidder sought disclosure of records relating to the bidding process. VTrans asserted exemptions for financial information submitted by competing bidders, including "balance sheets, income statements, profit and loss statements, statements of retained earnings, statements of cash flows, five or six year freight and passenger flow projections . . . the names of current and potential shippers, stockholder information, and employee information." <u>Id</u>. at 344, 816 A.2d at 451. In affirming the trial court's determination that the records were exempt, we made several important observations about § 317(c)(9).

¶ 24. First, we concluded that the plain language of the exemption undermined any suggestion that the Legislature intended to limit this "statutory definition of trade secrets to proprietary information in the nature of intellectual property." <u>Id</u>. at 346, 816 A.2d at 453. The Legislature specifically included in the list of exempt information "compilations of information,"

---

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
  (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
  (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

9 V.S.A. § 4601(3).

and we recognized that this includes information, not patented, "known only to those individuals within a commercial concern" that creates "an opportunity to obtain a business advantage over competitors who do not know or use that information." Id. at 347, 816 A.2d at 454. We held that the financial information described above was generally private corporate information that gave its possessor a commercial advantage over others and was therefore exempt from disclosure.

¶ 25. Second, we concluded that a contrary interpretation would "lead[] to absurd or irrational results." Id. at 348, 816 A.2d at 454. Recognizing that the various businesses had submitted the sensitive financial information to allow for effective evaluation of their proposals by VTrans, we noted that interpreting § 317(c)(9) in a manner that does not protect this information "would significantly hamper VTrans's ability to conduct a comprehensive bid process." Id. at 348, 816 A.2d at 454-55. We explained, "[i]t is a matter of common sense that the disclosure of information the Government has secured from voluntary sources on a confidential basis will both jeopardize its continuing ability to secure such data on a cooperative basis and injure the provider's interest in preventing its unauthorized release." Id. at 348, 816 A.2d at 455 (quotation omitted). And we concluded, "if we construed the exemption" to be inapplicable, "contractors and service providers may decline to cooperate with the state, thus impairing the state's ability to make intelligent, well-informed decisions." Id. at 349, 816 A.2d at 455.

¶ 26. Third, and for the reasons set forth above, we held that voluntary submission of financial information that qualified for protection under § 317(c)(9) does not operate as a waiver of that protection. Id.

¶ 27. Applying this law, we conclude that the redacted information in this case is exempt from disclosure.[10] In particular, it is the type of information that "gives its user or owner an

---

[10] Like the trial court, we reject the argument that a court must review the unredacted document in camera (meaning privately in chambers) before considering whether the information is exempt. Such individualized review may be required in most cases where the content of the

12

opportunity to obtain business advantage over competitors who do not know it or use it," and BTC has made reasonable efforts to keep the information secret. 1 V.S.A. § 317(c)(9).

¶ 28. The undisputed record, our <u>Springfield Terminal Railway</u> decision, and persuasive authority from other jurisdictions support the contention that BTC would lose a business advantage over competitors if the redacted information were made public. BTC submitted an uncontradicted affidavit from its principal explaining that the anticipated project costs and revenues, financial projections, and confidential lease terms with a major prospective tenant contained in the document are the types of information considered highly sensitive in the real estate development industry. The principal explained that if competitors had access to BTC's financial projections and lease information, they could "reverse engineer" BTC's pricing and forecasting models and use the information to undercut BTC's pricing and terms. Prospective office, retail, and residential tenants could use the pricing and revenue information to obtain an unfair advantage over BTC in future negotiations. This undisputed evidence supports the City's position.

¶ 29. Moreover, in response to the City's statement of undisputed material facts, CLC did not dispute that the information BTC was required to share pursuant to the PDA, including market studies and feasibility analyses, was needed to test the assumptions in BTC's economic projections, and "would necessarily involve disclosure of information that if disclosed to BTC's competitors, could harm BTC commercially." This admission was not directed at the specific redactions at issue here, but it did relate to the type of information generally included within the Study.

¶ 30. Exempting this evidence is consistent with our analysis in <u>Springfield Terminal Railway</u>. As noted above, in that case we concluded that the company's projections of future

---

redacted information in a document is not entirely known. But we agree with the trial court that in this case, the content of each of the redactions is clear on the face of the redacted version of the document that is in the record.

passenger flow, as well as internal balance sheets and profit and loss statements, fell within the trade-secrets exemption because it was "generally private corporate information that gives its possessor a commercial advantage over others." 174 Vt. at 348, 816 A.2d at 454. As in Springfield Terminal Railway, the exemption here promotes not only the private company's interest in protecting its commercial secrets, but also the government's interest in "its continuing ability to secure such data on a cooperative basis . . . to make intelligent, well-informed decisions." Id. 174 Vt. at 348-49, 816 A.2d at 455.

¶ 31. Courts in other jurisdictions have likewise affirmed that similar information qualifies as trade secret, either for purposes of public records law exemptions, laws regulating misappropriation of trade secrets, or both. For example, the Ohio Supreme Court concluded that the price and duration terms in commercial subleases between subtenants and a private entity that leased a historic marketplace from a municipality were trade secrets exempt from disclosure under the Ohio public records law. State v. Corp. for Findlay Mkt., 2013-Ohio-1532, 988 N.E.2d 546. The court based its conclusion in part on expert testimony that the term and rental rates for subleases in the commercial context are secrets closely guarded by property managers, and that knowledge of these items about competitors would be invaluable to property managers. Id. ¶ 19. Concluding that the "information derives independent economic value from not being generally known," and that the sub-lessor took reasonable steps under the circumstances to maintain its secrecy, the court affirmed the denial of the public records law claim. Id. ¶¶ 20-26; see also Utah v. U.S. Dep't of Interior, 256 F.3d 967, 971 (10th Cir. 2001) (concluding in analysis of federal Freedom of Information Act (FOIA) exemption that competitive disadvantage to tribe and nuclear waste storage company would be "overwhelming" if core terms of lease were publicly disclosed); Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 160 F. Supp. 3d 226, 238 (D.D.C. 2016) (holding in FOIA case that vendor would be put at competitive disadvantage if unit pricing information were made public); Hyman Cos., Inc. v. Brozost, 119 F. Supp. 2d 499, 504

14

n.1 (E.D. Pa. 2000) (concluding that knowledge of lease negotiations and profitability of individual stores was subject to protection under state laws protecting against disclosure of trade-secret information). Given these considerations, we conclude that BTC derives a business advantage from the continued confidentiality of the redacted information.

¶ 32. In addition, we conclude that BTC has made reasonable efforts to protect the confidentiality of the information at issue. This conclusion is based on the undisputed evidence of BTC's efforts and does not turn on the validity of the NDA vis-à-vis the City. The record is clear that BTC went to great lengths to protect the confidentiality of the redacted information. The uncontested affidavit of BTC's principal states that: BTC only shares the information with third parties when absolutely necessary, and only then on the condition that the information not be shared further; BTC had a confidentiality agreement with its own consultant prohibiting the sharing of the financial information without BTC's consent; before disclosing the study to ECONorthwest, BTC required the contractor to sign the NDA; and BTC requested confirmation from the City that it acknowledge the NDA. This evidence shows more than reasonable efforts to protect the confidentiality of the information.

¶ 33. We reject CLC's suggestion that the reasonableness of BTC's efforts in this regard turns on the enforceability of the NDA vis-à-vis the City. There is no requirement an entity enter into a binding NDA with a government agency before disclosing trade-secret information to invoke the PRA exemption in 1 V.S.A. § 317(c)(9). If there were, then none of the records in the Springfield Terminal Railway case would have been exempt from disclosure, as that decision makes no reference to any nondisclosure agreement with the State. Here, the undisputed evidence is that BTC did not disclose this information to third parties unless necessary, and when it did, it generally entered into confidentiality agreements—as it did when disclosing the information to ECONorthwest. Even if the City's "acknowledgment" of that agreement were not binding on the City—either because it was not properly enacted by the City Council, or because the City cannot

15

by agreement circumvent its obligation to make disclosures for otherwise nonexempt public records—we conclude, in the absence of contrary evidence as to the standard of reasonableness, that BTC's efforts to protect the confidentiality of the protected information was reasonable.[11]

¶ 34.    For the above reasons, we conclude that the information that has been redacted from the Study falls within the PRA exemption for trade secrets, 1 V.S.A. §317(c)(9), and accordingly affirm the trial court's summary judgment for the City, and dismissal of CLC's claims against BTC.[12]

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

[11] Moreover, even if CLC's belated assertion that City Councilors and others from the City viewed the information in an executive session of the Finance Board had been established in the summary judgment record, we would reach the same conclusion. The act of sharing the information in a nonpublic executive session of an otherwise open meeting is fully consistent with reasonable efforts to protect the confidentiality of the information.

[12] In its appeal brief, CLC represents that UVMMC publicly confirmed that it had agreed to pay $22 per square foot to lease 80,000 to 100,000 square feet from BTC, and argues that the trade-secrets exemption cannot apply to such publicly confirmed information. We agree generally that the exemption cannot apply to information that has been made widely known by the lessor or the lessee. However, because CLC's assertion is based on evidence post-dating the summary judgment decision and outside of the summary judgment record, we do not address its specific argument here. It also asserts that the information is not exempt because it is publicly available through UVMMC pursuant to the PRA. In making this assertion, CLC relies on cases in which we have applied the PRA to the University of Vermont. It has offered no briefing with respect to the status of UVMMC as a public agency, and we accordingly decline to reach this argument. See Bishop v. Town of Barre, 140 Vt. 564, 579, 442 A.2d 50, 57 (1982) (explaining that "this Court will not search the record for errors inadequately briefed").