[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 396.]

THE STATE EX REL. BESSER ET AL., APPELLANTS, *v.* OHIO STATE UNIVERSITY ET AL., APPELLEES.

[Cite as *State ex rel. Besser v. Ohio State Univ.*, 2000-Ohio-207.]

*Public records—Trade secrets—Mandamus sought to compel Ohio State University to make available for inspection all records concerning or relating to university's acquisition of Park Medical Center, a private Columbus hospital—Writ granted in part and denied in part.*

(No. 99-394—Submitted May 9, 2000—Decided August 9, 2000.)

IN MANDAMUS.

—————————

{¶ 1} On February 18, 1999, relator Kenneth R. Besser ("Besser"), an attorney, sent a letter to respondent Ohio State University ("OSU"), stating that he represented his wife, relator Susan L. Besser, M.D., and Bexley Family Medicine in their lawsuit against OSU, and that he was requesting under R.C. 149.43, Ohio's Public Records Act, that OSU make available for inspection "all records of OSU concerning or relating to OSU's acquisition of Park Medical Center," a private Columbus hospital. OSU had created and collected records concerning the acquisition.

{¶ 2} On February 23, the Bessers filed this action for a writ of mandamus to compel respondents, OSU, OSU Hospitals Board, Manuel Tzagournis, M.D., OSU Vice-President for Health Sciences, OSU Hospitals Board, Grayce M. Sills, Chairperson of the OSU Hospitals Board, and R. Reed Fraley, M.D., Secretary of the OSU Hospitals Board and Executive Director of the Ohio State Hospital Systems (collectively referred to as "OSU"), to provide access to the requested records under R.C. 149.43. The Bessers then voluntarily dismissed their pending lawsuit against OSU in the Court of Claims, and OSU provided them with access

to requested minutes of OSU Hospitals Board and OSU Strategic Planning Committee meetings relating to the acquisition.

{¶ 3} The matter was referred to the court's mediation program, and during that process, on April 8, 1999, OSU publicly announced its acquisition of Park Medical Center. Following mediation, the matter was returned to the regular docket, and we granted an alternative writ and issued a schedule for the presentation of evidence and briefs. 86 Ohio St.3d 1439, 713 N.E.2d 1050. We also dismissed as moot the Bessers' claims relating to OSU Hospitals Board and OSU Strategic Planning Committee minutes. *Id.*

{¶ 4} The parties clarified the scope of the Bessers' records requests and OSU provided them with some responsive records relating to the Park Medical Center acquisition. OSU withheld the remainder of the requested records, claiming that R.C. 149.43(A)(1)(p) (now R.C. 149.43[A][1][q] [see Am.Sub.S.B. No. 55, Baldwin's Ohio Legislative Service Annotated (Vol.7, 1999), L-904]) and 149.43(A)(1)(m) and (5) exempted them as trade secrets, intellectual property, and attorney-client privileged material. The Bessers claimed that (1) although former R.C. 1333.51 exempted the disclosure of trade secrets under R.C. 149.43, the repeal of former R.C. 1333.51 in 1996 removed any trade secrets exemption, (2) public entities like OSU could not have trade secrets, and (3) OSU had not established that the records withheld from the Bessers constituted trade secrets.

{¶ 5} Upon a consideration of the evidence and briefs, we held that "trade secrets remain exempt from disclosure under R.C. 149.43(A)(1)(p) (now R.C. 149.43[A][1][q]) and that governmental entities like OSU can have trade secrets, but that respondents should submit the records they claim to be exempt as trade secrets and intellectual property records to the court under seal for an *in camera* review." *State ex rel. Besser v. Ohio State Univ.* (2000), 87 Ohio St.3d 535, 543, 721 N.E.2d 1044, 1051. We also ordered OSU to submit records that they have already provided to the Bessers in response to their public records request, upheld

2

OSU's claimed exemption for two of the requested records because they were privileged attorney-client records, and denied the Bessers' request for attorney fees. *Id.*, 87 Ohio St.3d at 542-543, 721 N.E.2d at 1050-1051.

{¶ 6} This cause is now before the court upon our *in camera* review of the records.

————————————

*Kenneth R. Besser*, for relators.

*Betty D. Montgomery*, Attorney General, *Mark R. Weaver*, Special Counsel to the Attorney General, *Lisa Wu Fate* and *Jan Alan Neiger*, Assistant Attorneys General, for respondents.

————————————

*Per Curiam.*

{¶ 7} In reviewing the records withheld by OSU, the precept guiding our analysis is that the inherent, fundamental policy of R.C. 149.43 is to promote open government, not restrict it. *State ex rel. The Miami Student v. Miami Univ.* (1997), 79 Ohio St.3d 168, 171, 680 N.E.2d 956, 959. Consistent with this policy, exceptions to disclosure must be strictly construed against the public records custodian, and the custodian bears the burden to establish the applicability of an exception. *State ex rel. McGowan v. Cuyahoga Metro. Hous. Auth.* (1997), 78 Ohio St.3d 518, 519, 678 N.E.2d 1388, 1389.

{¶ 8} With these guidelines in mind, we initially consider OSU's assertion that two of the withheld records are excepted from disclosure as intellectual property records under R.C. 149.43(A)(1)(m). The intellectual-property-record exception was designed to prevent private persons from using the Public Records Act to appropriate intellectual property for private gain. *State ex rel. Rea v. Ohio Dept. of Edn.* (1998), 81 Ohio St.3d 527, 533, 692 N.E.2d 596, 602. R.C. 149.43(A)(5) defines "intellectual property record" as "a record, *other than a financial or administrative record*, that is produced or collected by or for faculty or

staff of a state institution of higher learning in the conduct of or as a result of study or research on an educational, commercial, scientific, artistic, technical, or scholarly issue, regardless of whether the study or research was sponsored by the institution alone or in conjunction with a governmental body or private concern, and that has not been publicly released, published, or patented." (Emphasis added.)

{¶ 9} In construing R.C. 149.43(A)(5), the words used must be construed in accordance with rules of grammar and common usage. *Nibert v. Ohio Dept. of Rehab. & Corr.* (1998), 84 Ohio St.3d 100, 102, 702 N.E.2d 70, 72. Financial records relate to the business system of managing money and investments, and administrative records concern the management and performance of the executive duties of a government, institution, or business. See Garner, Black's Law Dictionary (7 Ed.1999) 44 and 644; Webster's Third New International Dictionary (1986) 28 and 851.

{¶ 10} Under R.C. 149.43(A)(5), financial and administrative records do not constitute intellectual property records that are exempt from disclosure under R.C. 149.43. The two records claimed by OSU to be intellectual property records are OSU's preliminary business plan and *pro forma* for the Park Medical Center transaction, which include charts and tables outlining financial calculations and projections. These records are both financial records. They contain financial calculations concerning the acquisition of Park Medical Center, as well as administrative records, *i.e.*, they concern OSU's administrative decision to acquire the hospital.

{¶ 11} Therefore, the intellectual-property-record exception of R.C. 149.43(A)(1)(m) and (A)(5) does not exempt these records from disclosure.

{¶ 12} OSU next contends that all of the withheld records, including the preliminary business plan and the *pro forma*, are exempt from disclosure under R.C. 149.43 because they are trade secrets. Trade secrets are exempt from

disclosure under the "state or federal law" exemption of R.C. 149.43. *Besser*, 87 Ohio St.3d at 540, 721 N.E.2d at 1049.

{¶ 13} R.C. 1333.61(D), part of Ohio's adoption of the Uniform Trade Secrets Act, defines "trade secret" to include "any information, including * * * any business information or plans, financial information, or listing of names * * * that satisfies both of the following:

"(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

"(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

{¶ 14} We have also adopted the following factors in analyzing a trade secret claim:

"(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.* (1997), 80 Ohio St.3d 513, 524-525, 687 N.E.2d 661, 672, citing *Pyromatics, Inc. v. Petruziello* (1983), 7 Ohio App.3d 131, 134-135, 7 OBR 165, 169, 454 N.E.2d 588, 592.

{¶ 15} An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy. See *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 181, 707 N.E.2d 853, 862.

**{¶ 16}** We apply the foregoing factors in determining OSU's trade secret claims regarding the various records it has withheld from the Bessers.

*2/4/99 Memorandum to OSU Officials from OSU Employee Regarding Asset Purchase Agreement for Park Medical Center and Draft Asset Purchase Agreement*

**{¶ 17}** OSU claims that the memorandum is a trade secret because of a conclusory statement in an affidavit of the executive director of Ohio State Hospitals Systems that it "derives potential economic value from not being generally known to, and not being readily ascertainable to, persons who can obtain economic value from its disclosure." The memorandum, however, in and of itself, does not disclose any information that retains any potential economic value for either OSU or its competitors. See *Plain Dealer*, 80 Ohio St.3d at 527, 687 N.E.2d at 674. Instead, it merely references a copy of an asset purchase agreement without disclosing its terms. *Id.*

**{¶ 18}** OSU also withheld the draft asset purchase agreement referred to in the memorandum. The draft agreement relates to the since-completed acquisition of Park Medical Center by OSU. In *Plain Dealer*, we relied on commentary from the Restatement of Torts to hold that "[i]nformation related to a single, ephemeral event in the conduct of a business does not meet the requirement that a trade secret be 'a process or device for continuous use in the operation of the business.' " *Id.*, 80 Ohio St.3d at 526, 687 N.E.2d at 673, quoting Restatement of the Law, Torts (1939), Section 757, Comment *b*; see, also, *Wisconsin Elec. Power Co. v. Pub. Serv. Comm. of Wisconsin* (1983), 110 Wis.2d 530, 329 N.W.2d 178, holding that documents relating to draft contracts, bids, and letters of negotiation are not trade secrets.

**{¶ 19}** The Commissioners on Uniform State Laws who drafted the Uniform Trade Secrets Act, as adopted in Ohio, noted "[t]hat the definition of 'trade secret' [in the Uniform Act] contains a reasonable departure from the Restatement

of Torts (First) definition which required that a trade secret be 'continuously used in one's business.' " Uniform Trade Secrets Act, Sec. 1, Comment (1990), 14 U.L.A. 437, 439; *Minuteman, Inc. v. Alexander* (1989), 147 Wis.2d 842, 852-853, 434 N.W.2d 773, 777. The broader definition in the Act, as well as R.C. 1333.61(D), "extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use" and "includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor." (Emphasis *sic*.) 14 U.L.A. 439.

{¶ 20} Therefore, the mere fact that the draft asset purchase agreement relates to a single event, *i.e.*, OSU's acquisition of a private hospital, and is not continuously used in OSU's business does not preclude it from being a trade secret that is exempt from disclosure.

{¶ 21} But there still must be evidence that the draft agreement constitutes a trade secret. OSU did not introduce sufficient evidence to establish that the draft agreement retains potential, independent economic value from not being readily ascertainable by proper means by competitors. R.C. 1333.61(D)(1). In fact, even OSU's conclusory affidavit statement covers only the February 4, 1999 memorandum and *not* the draft agreement to which it refers. There is also no evidence that the draft agreement was actually adopted or which, if any, of its terms have potential economic value in future transactions involving OSU.

{¶ 22} Consequently, the February 4, 1999 memorandum and the draft agreement do not constitute trade secrets and are subject to disclosure under R.C. 149.43.

*1/28/99 OSU Preliminary Business Plan for Park Medical Center*

{¶ 23} OSU claims that the preliminary business plan drafted by Arthur Andersen Healthcare Services for OSU's proposed acquisition of Park Medical Center is also a trade secret. Like the other withheld records, OSU relies on

conclusory affidavit statements to support its claims. For example, OSU provided affidavit evidence that "[r]elease of strategic plans and other negotiation information surrounding The Ohio State University's purchase of Park Medical Center even *after* the conclusion of negotiations would put The Ohio State University Hospitals at a significant economic disadvantage." (Emphasis *sic.*)

{¶ 24} OSU argues that based on this evidence, if it enters into any future negotiations similar to the Park Medical Center transaction, opposing parties could use these secrets to determine OSU's valuation process, negotiating style, and internal process for making and receiving offers, and that competitors can use this information even now to attack, undermine, and circumvent OSU's business strategies.

{¶ 25} Notably lacking, however, is any factual evidence to support these conclusory statements and argument. The assumptions made as well as the process of valuing Park Medical Center's future five-year financial performance if acquired by OSU are restricted to that transaction, based mainly on interviews with the hospital's staff. There is no credible evidence that this specific valuation process would in any way benefit OSU in future transactions involving the acquisition of other private hospitals or that the assumptions underlying OSU's valuation of a potential purchase target would be comparable in future purchases. Nor is there evidence that the valuation process is sufficiently unique in the hospital industry that competitors would obtain a cognizable economic benefit from its disclosure. In fact, OSU has already publicly disclosed a detailed appraisal of Park Medical Center that OSU used in its acquisition determination. The disclosed appraisal also includes a projection of income and expenses for Park Medical Center for five years and beyond.

{¶ 26} In addition, a record is entitled to trade secret status " 'only if the information is not generally known or readily ascertainable to the public.' " *State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*

(2000), 88 Ohio St.3d 166, 173, 724 N.E.2d 411, 418, quoting *Plain Dealer*, 80 Ohio St.3d at 529, 687 N.E.2d at 675. Some of the information contained in the preliminary business plan is already readily ascertainable to the public from financial reports and other public sources, *e.g.*, Ohio Hospital Association records.

**{¶ 27}** Further, the plan contains seven pages of numerical "service-line definitions," and there is no evidence that OSU retains any economic benefit in keeping these numerical designations private.

**{¶ 28}** There is, however, one page of the preliminary business plan that satisfies the definition of a trade secret. This page lists the names of the top patient-volume physicians of Park Medical Center and their characteristics. The disclosure of this page would permit OSU's competitors to determine which physicians affiliated with Park Medical Center produce the most revenue, and competitors could target these physicians in order to increase their revenues, to the detriment of OSU. This list is similar to a business's customer list, which constitutes an intangible asset that is presumptively a trade secret when the owner of the list takes measures to prevent its disclosure in the ordinary course of business to persons other than those selected by the owner. *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 264, 602 N.E.2d 1159, 1163; see, also, 1 Milgrim on Trade Secrets (1999), 1-475-476, Section 1.09[8][g], noting that the effectiveness and good performance of key sales and other personnel can be protected trade secrets.

**{¶ 29}** Therefore, aside from one page of the preliminary business plan containing the names and characteristics of the high-patient-volume physicians of Park Medical Center, the plan does not contain trade secrets.

*1/5/99 Outline of Emergency Department Staffing Contract and Profit/Loss Analysis*

{¶ 30} OSU contends that the outline, which it used to negotiate the emergency department staffing contract for the Park Medical Center transaction, is a trade secret. Again, however, OSU failed to meet its evidentiary burden to establish how disclosure of this information, specific to the completed transaction, would benefit OSU's competitors. There is also no evidence that the proposed contractual terms in the outline were actually included in any finalized staffing contract. These records must be disclosed.

*Summaries Describing Goals for Park Medical Center Transaction*

{¶ 31} OSU claims that its summaries concerning its goals in acquiring Park Medical Center are exempt from disclosure as trade secrets. But the majority of the information in these summaries has already been disclosed to the Bessers through previously released summaries or, like the preliminary business plan, does not retain potential, independent economic value from not being readily ascertainable by proper means by OSU's competitors.

*December 2, 1998 Electronic Mail*

{¶ 32} This electronic mail message specifies the average nursing salary, square footage, and total acreage for Park Medical Center before its acquisition by OSU. The message contains information that is either readily ascertainable from other sources or that does not possess potential, independent economic value following the completion of the acquisition of Park Medical Center by OSU. The document must be disclosed.

*Pro forma for the Acquisition*

{¶ 33} OSU next asserts that its *pro forma* created for the transaction is exempt as a trade secret. The *pro forma* contains financial projections and the assumptions made in calculating the projections. Like the preliminary business plan, which contains comparable assumptions and financial projections, the *pro*

*forma* is restricted to the transaction, and there is no specific, credible evidence that the methodology used in the acquisition of Park Medical Center would be useful in future transactions, *i.e.*, the methodology does not appear to have potential, independent economic value to OSU's competitors either now or in the future. Therefore, the *pro forma* must be disclosed.

### *2/5/99 Status Report on Park Medical Center Transaction*

{¶ 34} The next document for which OSU claims trade secret status is a status report on the acquisition of Park Medical Center. This document contains information that has already been publicly disclosed by OSU in other records as well as information that would not provide potential, independent economic benefit to OSU's competitors. The status report is not a trade secret.

### *Printed Notes of OSU Transaction Meetings, Lists of Team Members and Working Assumptions*

{¶ 35} The printed notes of OSU meetings concerning the transaction and related records also do not constitute trade secrets. Knowledge of this information, including working assumptions for the operation of Park Medical Center in relation to OSU, is either readily ascertainable, *e.g.*, the configuration of the board of trustees of Park Medical Center after it was acquired by OSU, or not of any cognizable benefit to OSU's competitors.

### *January 11, 1999 Memorandum Regarding List of Park Medical Center Staff and Top Admitters*

{¶ 36} The memorandum and related list reveal the names of the top patient-volume members of the medical staff at Park Medical Center. Like the one page of OSU's preliminary business plan containing similar information, these records constitute trade secrets and are therefore exempt from disclosure under R.C. 149.43.

*Note and Research on Potentially Comparable Hospitals*

{¶ 37} Finally, OSU asserts that research on two New York City hospitals specializing in certain surgeries is a trade secret and, hence, not subject to disclosure. This research, however, appears to have been taken from sources readily available to the public, *e.g.*, American Hospital Association Guide, magazine articles, and financial reports. And there is no evidence concerning either the amount of effort or money expended in obtaining and developing this information. *Pyromatics*, 7 Ohio App.3d at 135, 7 OBR at 169, 454 N.E.2d at 592. Therefore, these records are subject to disclosure.

*Conclusion*

{¶ 38} In sum, for the most part, OSU's reliance on conclusory affidavit statements is insufficient to satisfy its burden to identify and demonstrate that the records withheld and portions of records redacted are included in categories of protected information under R.C. 1333.61(D). *Fred Siegel Co., L.P.A.*, 85 Ohio St.3d at 181, 707 N.E.2d at 862. OSU did not establish that these records derived actual or potential independent economic value from not being generally known to, and not being readily ascertainable to, persons who can obtain economic value from their disclosure. R.C. 1333.61(D)(1). For example, OSU did not introduce specific factual evidence concerning the savings effected and the value to OSU in having the information as against its competitors, the amount of effort or money expended by OSU to obtain and develop the information, and the amount of time and expense it would take for OSU's competitors to duplicate the information. *Plain Dealer*, 80 Ohio St.3d at 524-525, 687 N.E.2d at 672. Our conclusion is consistent with our duty in public records cases to strictly construe exemptions from disclosure under R.C. 149.43 and to resolve any doubts in favor of disclosure of public records. See *State ex rel. Gannett Satellite Info. Network, Inc. v. Petro* (1997), 80 Ohio St.3d 261, 264 and 266, 685 N.E.2d 1223, 1227-1228.

**{¶ 39}** Based on the foregoing, we grant a writ of mandamus to compel respondents to provide the Bessers with access to all portions of the withheld and redacted records, with the exception of the one page of the preliminary business plan and the memorandum and related list containing the names of the top patient-volume medical personnel at Park Medical Center.

*Writ granted in part and denied in part.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

RESNICK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

**{¶ 40}** I concur with the majority that the intellectual-property-record exception does not exempt from disclosure the preliminary business plan and *pro forma* because they are in the nature of a financial or administrative record, not the product of study or research. See *State ex rel. Rea v. Ohio Dept. of Edn.* (1998), 81 Ohio St.3d 527, 533, 692 N.E.2d 596, 602.

**{¶ 41}** However, I believe that the withheld documents constitute trade secrets and therefore are excepted from disclosure under R.C. 149.43. Relators made the broad request for "all records of OSU concerning or relating to OSU's acquisition of Park Medical Center." OSU produced approximately two hundred seventy-eight documents in response to the request. This dispute, according to OSU, concerns only seventeen documents from the files and documents maintained by Dr. Manuel Tzagournis, OSU's Vice President for Health Sciences, that OSU withheld from production.

**{¶ 42}** OSU produced evidence in the form of affidavits that these documents are confidential documents made known only to certain persons within OSU who have a need to know the information within them. These documents comprise a business plan, strategies, negotiations, and financial information utilized by OSU in the Park Medical Center acquisition. They may also apply to other

potential targets for acquisition. Although a public entity, OSU must nevertheless compete in the health care market with the private sector. OSU expended time and money, either internally or through outside consultants, to compile the financial and statistical information in these documents that is not "readily ascertainable" in the public forum. It would take time and money for competitors of OSU to acquire and duplicate this information. Disclosure of these documents would result in a windfall for relators and other competitors of OSU at OSU's (and consequently, the taxpayer's) expense. See *Pyromatics, Inc. v. Petruziello* (1983), 7 Ohio App.3d 131, 134-135, 7 OBR 165, 169, 454 N.E.2d 588, 592.

{¶ 43} I believe that these documents collectively comprise a business plan from which OSU derives economic value because the information is not known to others who can obtain economic value from its disclosure and the documents are subject to efforts to keep them confidential. R.C. 1333.61(D). Consequently, they constitute trade secrets exempt from disclosure. The significance of each document must be considered in relation to its contribution to the whole plan. I believe that the trade secret status of these documents should not be analyzed on a piecemeal basis, but instead, they should be considered as part of a plan. Sometimes our quest for openness may narrowly focus on the obscure detail without placing it into the context of the overall picture.

{¶ 44} Once these documents are released to the public, competitors of OSU will become privy to OSU's confidential strategies, plans, valuation techniques, and negotiating tools utilized in complex financial transactions. These documents are valuable to OSU from not being generally known to or not being readily ascertainable by others who can obtain economic value from them. Relators are Susan L. Besser, M.D., a physician, and her husband, an attorney. They are potential competitors who may obtain economic value and undermine OSU's investment as a result of the disclosure of these documents. I believe this opinion effectively eviscerates the trade secret exemption of the Public Records Act.

14

RESNICK, J., concurs in the foregoing opinion.

_____