[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *McDougald v. Greene*, Slip Opinion No. 2020-Ohio-4268.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4268

MCDOUGALD *v.* GREENE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *McDougald v. Greene*, Slip Opinion No. 2020-Ohio-4268.]

*Mandamus—Public Records Act—R.C. 149.43—Security records are exempt from disclosure under the Public Records Act—Writ denied.*

(No. 2019-0677—Submitted February 11, 2020—Decided September 2, 2020.)

IN MANDAMUS.

_____

**DeWine, J.**

{¶ 1} In this mandamus case, Jerone McDougald, who was an inmate at the Southern Ohio Correctional Facility, requested copies of the prison's most recent shift-assignment duty rosters, documents that detailed the assignment of prison guards to various posts within the prison. Larry Greene, the prison's public-records custodian, turned over the records, but he redacted almost all the information, leaving only the page headings, dates, and shift-supervisor signature lines. We must decide whether, by redacting almost all of the information in the documents,

Greene violated his duties under Ohio's Public Records Act, R.C. 149.43. As we explain, the documents fall under the security-records exemption to the Public Records Act, and as such, Greene had no legal duty to turn them over. Thus, we deny McDougald's request for a writ of mandamus.

**Background**

{¶ 2} In February 2019, McDougald sent Greene a prison kite requesting the prison's "most current [shift-assignment] duty rosters" for the first, second, third, and fourth shifts at the prison. A few weeks later, Greene responded that he would provide copies of the records if McDougald paid 40 cents for the copies. But, Greene warned, the records would be heavily redacted, leaving only the "page headings, dates, and shift supervisor signature lines." Greene also wrote that "the legal basis for these redactions are 'security record,' per Ohio Revised Code (RC) 149.433 (A) and (B) and 'plans * * * for disturbance control,' per RC 5120.21(D)(2)."[1] (Ellipsis sic.) McDougald paid the cost and received the documents, which were highly redacted, just as Greene had warned. McDougald then filed the present mandamus action, arguing that the redactions were improper, that he is entitled to unredacted copies of the records, and that he should be awarded costs and statutory damages.

{¶ 3} We ordered Greene to submit unredacted copies of the shift-assignment duty rosters for in camera review. 156 Ohio St.3d 1469, 2019-Ohio-2953, 126 N.E.3d 1184. Each roster is a two-page form. The first page divulges the identity of the captain and lieutenant on duty, the names of officers assigned to

---

1. The dissent accuses this opinion of ignoring Greene's statutory obligation to explain the legal basis for the redaction of the requested records, *see* R.C. 149.43(B)(3). But this is an issue raised by the dissent, not McDougald. McDougald's complaint contains no such claim. Tellingly, the only support the dissent cites for its assertion that McDougald raised the issue is an out-of-context passage from McDougald's merit brief. On fair reading, however, that passage relates only to McDougald's argument that Greene cannot meet his burden of proving that the security-records exemption applies. Because McDougald has not raised any claim about the adequacy of Greene's explanation, we decline to address that issue.

various locations around the prison, and the names of officers assigned as "escorts." The first page also lists names under categories such as "good days" and "other absences." At the bottom of the page are handwritten notes, which include things like staff announcements, security reminders, or incident updates. The second page provides totals for the number of officers assigned to "permanent posts" and "additional posts." It also provides tallies related to various reasons for absences and indicates officer shortages or overages. The document is then signed by the shift supervisor.

**Analysis**

{¶ 4} Under R.C. 149.43(B)(1), a public office is required to make copies of public records available to any person on request and within a reasonable period of time. A "public record" is a record "kept by any public office." R.C. 149.43(A)(1). A party who believes that his request for a public record has been improperly denied may file a mandamus action in order to compel production of the record. R.C. 149.43(C)(1)(b). That is what McDougald has done here. For McDougald to succeed in his mandamus action, he must demonstrate that he has a clear legal right to the documents and that Greene has a clear legal duty to turn them over. *State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 10.

{¶ 5} The parties do not dispute that the prison is a public office subject to the Public Records Act. But, relevant here, the Public Records Act contains several exemptions that exclude certain records from disclosure. In his briefing, Greene claims that two of those exemptions—the "infrastructure-records exemption," R.C. 149.433(B)(2), and the "security-records exemption," R.C. 149.433(B)(1), apply here. As we explain, the records at issue are not infrastructure records but they are security records. Because they are security records, they are exempt from disclosure under the Public Records Act and Greene has no legal duty to turn them over.

*Infrastructure Records*

{¶ 6} We begin with the infrastructure-records exemption. R.C. 149.433(A) defines an infrastructure record as "any record that discloses the configuration of critical systems including, but not limited to, communication, computer, electrical, mechanical, ventilation, water, and plumbing systems, security codes, or the infrastructure or structural configuration of a building." But the definition goes on to explain that infrastructure records do not include "a simple floor plan that discloses only the spatial relationship of components of the building." *Id.*

{¶ 7} Greene does not meaningfully explain how the assignment of guards to specific areas of the prison satisfies this statutory definition. And it is hard to see how he could. It is not even facially plausible to think that guard assignments constitute the "configuration of a critical system," *id.* And guard locations have little similarity to the systems that the statute identifies as examples that fall under this exemption—communication, computer, electrical, mechanical, ventilation, water, and plumbing systems. Nor does the assignment of guards within a building count as relating to the "structural configuration *of a building*." Guards, after all, are not part of the building.

{¶ 8} Nevertheless, Greene insists that the documents showing the location of the guards are infrastructure records based on an isolated bit of dicta from *State ex rel. Rogers v. Dept. of Rehab. & Correction*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, ¶ 12. *Rogers* addressed whether security-camera footage of a use-of-force incident was exempt under the infrastructure-records exemption. This court concluded that because the video showed no more than what could have been gleaned from a simple floor plan, the footage was not an infrastructure record. But this court went on to comment that the footage did not "show the location of any fire or other alarms, *correctional-officer posts*, or the configuration of any other critical system." (Emphasis added.) *Id.* From this isolated reference to

"correctional-officer posts," Greene would have us conclude that a document identifying the location of guards in a prison must be an infrastructure record. But *Rogers* provides no analysis of how or when correctional-officer posts constitute infrastructure records. And picking up isolated bits of dicta and running with them without returning to the statutory text can lead to legal gobbledygook, in much the same way that a game of telephone can lead to miscommunication. Because there is no basis in the statutory text for concluding that the duty rosters are infrastructure records, we reject Greene's argument.

*Security Records*

{¶ 9} Next, we turn to the security-records exemption. Among the items exempt from disclosure are "security records," which includes "[a]ny record that contains information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage." R.C. 149.433(A)(1). It is clear from the face of the documents that this exemption applies to the records at issue here. The shift-assignment duty rosters detail the identity and location of guards posted throughout the prison. One need not be too creative to see how this is information that could be used to plan an escape or an attack on the prison or to aid in the smuggling in of contraband. Where the guards are posted, which guards are assigned to a particular post, and how many there will be are almost certainly among the first things a person planning an attack or escape or trying to sneak something in would want to know. The information could reveal potential areas of lessened security. And the post-assignment information could be used to target individual guards who might be thought easier to overcome or susceptible to improper influence. The obvious correlative is that information about the movements of a prison's *guards* would be used by the prison to ensure the security of the facility. We thus have no problem concluding that the shift-assignment duty rosters are security records for purposes of the Public Records Act because they

5

contain information "directly used for protecting or maintaining the security" of the prison.

{¶ 10} To be sure, Greene's argument on this front is cursory, at best. Indeed, it consists of a single sentence asserting that the exemption applies. And his supporting affidavit doesn't do much to aid his argument. But for the fact that the relevance of the records to the security of the prison is apparent from the face of the documents, we might well reach a different result in this case. But as we have suggested in the past, a public-records custodian may meet his burden when the stated exemption upon which he relies is "based on risks that are * * * apparent within the records themselves," *Rogers* at ¶ 15.

{¶ 11} This court's decision in *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 732 N.E.2d 373 (2000), is illustrative. *Besser* dealt with a request submitted to a state university for records regarding the university's acquisition of a hospital. The university asserted that the records constituted trade secrets and were protected from disclosure. This court found that the conclusory statements in the affidavit presented by the university were insufficient to establish that the exemption applied, and the court ordered the university to disclose most of the requested records.

{¶ 12} The dissent relies on *Besser* for the proposition that a custodian's failure to provide additional evidentiary support for a claimed public-records exemption mandates the disclosure of the records. But what the dissent fails to mention is that the evidentiary deficiencies notwithstanding, the court in *Besser* found that a limited portion of the records constituted trade secrets and were therefore exempt from disclosure, *id.* at 402, 404. Contrary to the dissent's claims, the *Besser* court did not consider additional evidence regarding the applicability of the trade-secret exemption to these documents. The court simply concluded that the documents "constitute trade secrets and are therefore exempt from disclosure under R.C. 149.43," *id.* at 404; *see also id.* at 402 (finding that a portion of the

requested record "satisfie[d] the definition of a trade secret"). In other words, the applicability of the exemption was manifested by the documents themselves. *Id.* at 402; *see also Rogers*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, at ¶ 15, citing *Besser*.

{¶ 13} That rule makes sense, especially in this case. After all, the point of the security-records exemption is to protect other important public interests such as the safety and security of the public. And, at least when the applicability of the exemption is obvious from the face of the documents, this court will not sacrifice those interests simply because a party should have done a better job setting forth the obvious.

**Conclusion**

{¶ 14} For the foregoing reasons, we deny McDougald a writ of mandamus ordering Greene to disclose the records to him. Accordingly, we also deny McDougald's request for court costs and statutory damages. McDougald's motion to amend his complaint to correct the caption is denied as moot.

Writ denied.

O'CONNOR, C.J., and FRENCH, FISCHER, and DONNELLY, JJ., concur.

STEWART, J., concurs in judgment only.

KENNEDY, J., dissents, with an opinion.

———————————

**KENNEDY, J., dissenting.**

{¶ 15} I dissent because I must. To meet its burden regarding the applicability of an exception to Ohio's Public Records Act, R.C. 149.43, a public office must prove that the requested records "fall squarely within [an] exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10. Further, the plain and unambiguous language of R.C. 149.43 provides a specific process for a public office to follow when denying a

public-records request and when defending that denial in a requester's mandamus action.

{¶ 16} When a public-records request is denied, R.C. 149.43(B)(3) requires a public office to "provide the requester with an explanation, including legal authority, setting forth why the request was denied." If the requester subsequently files a petition for a writ of mandamus, the public office may "rely[] upon additional reasons or legal authority in defending" the mandamus action. *Id.* However, the public office may not rest on assertions in a brief or conclusory statements in an affidavit, but rather it bears the burden to affirmatively establish through specific, relevant evidence that an exception to disclosure applies. *See State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 398, 400-401, 732 N.E.2d 373 (2000).

{¶ 17} Here, respondent, Larry Greene, the public-records custodian at the Southern Ohio Correctional Facility ("SOCF"), denied the public-records request of relator, Jerone McDougald, but he failed to comply with the statutory process for explaining a refusal and ultimately failed to argue and present evidence to prove that the records sought by McDougald fit squarely within an exception to disclosure under R.C. 149.43.

{¶ 18} In this case, Greene gave an insufficient and imprecise response when he initially denied the request from McDougald. And when McDougald filed a petition for a writ of mandamus in this court, Greene abandoned his original legal theory—that the records are security records—for another theory—that the records are infrastructure records. Even the majority agrees that the new theory fails.

{¶ 19} But the majority, playing the roles of evidentiary witness, advocate, and judge, rescues Greene, resuscitating and expanding on his original legal theory, presenting its own evidence showing how information in the shift-assignment duty rosters might be used to jeopardize the prison's security, and declaring that Greene has no legal duty to turn over the unredacted records to McDougald. But how McDougald might use the information is beside the point. Whether the security-

record exception of R.C. 149.433(A)(1) applies depends on whether SOCF itself "directly use[s]" the information contained in the record to "protect * * * or maintain * * * [its] security * * * against attack, interference, or sabotage," *id.* Because Greene has failed to provide any evidence about how the information contained in the shift-assignment duty rosters fits within R.C. 149.433(A)(1) or to make a meaningful case for the applicability of the security-records exception in this court, we should limit our review to whether the records that McDougald requested fit squarely within the infrastructure-records exception. Since the records are not infrastructure records, I would grant McDougald a writ of mandamus and order Greene to provide McDougald with unredacted copies of the records. Therefore, I dissent.

*Facts*

{¶ 20} In this case, McDougald sought SOCF's shift-assignment duty rosters for the first, second, third, and fourth shifts; he made his request in February 2019 and asked for the "most current" shift-assignment duty rosters. Greene responded to the request with shift-assignment duty rosters from March 7, 2019, that were nearly completely redacted. Only the number of the shift, the date, and the shift supervisor's signature were visible on all four shift-assignment documents. In a letter sent as part of his response, Greene explained the redactions in one sentence: "The legal basis for these redactions are 'security record,' per Ohio Revised Code (RC) 149.433(A) and (B), and 'plans * * * for disturbance control,' per RC 5120.21(D)(2)." (Ellipsis sic.) In Greene's answer to McDougald's petition for a writ of mandamus, Greene did not mention R.C. 149.433 or 5120.21. Moreover, in his merit brief, Greene fails to mention R.C. 5120.21(D)(2), and he makes just a single, unfocused statement pertaining to the security-records exception: "Furthermore, by the very definition asserted by Relator in his Brief, the requested documents constitute a security record pursuant to R.C. 149.433."

Instead, Greene's only developed argument is that the shift-assignment duty rosters are infrastructure records.

*The shift-assignment duty rosters are not infrastructure records*

{¶ 21} I agree with the majority that the shift-assignment duty rosters are not infrastructure records. Greene cites *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, for the proposition that a list of correctional-officer posts qualifies as an infrastructure record and therefore is exempt from disclosure under R.C. 149.433(B)(2). In *Rogers*, we decided whether a prison's video footage of a use-of-force incident from a security camera was a public record. The Department of Rehabilitation and Correction argued that the video disclosed the configuration or network of security cameras and therefore qualified as an infrastructure record and was exempt from disclosure. We rejected that argument because the video footage did not "reveal the location of any video cameras other than the one that recorded the incident at issue." *Id*. at ¶ 12. We further stated, "Nor does it show the location of any fire or other alarms, correctional-officer posts, or the configuration of any other critical system." *Id*. That sentence should not be mistaken for this court holding that video footage depicting the location of correctional-officer posts qualifies as an infrastructure record. We were not facing the issue whether a video depiction of the layout of the entire system of correctional-officer posts constituted an infrastructure record; rather, the opinion pointed out how limited the area was that had been shown in the footage that the inmate was requesting. *Rogers* decided only that the video footage in that case was not an infrastructure record. Any suggestion in *Rogers* that video footage depicting the layout of every correctional-officer post qualifies as an infrastructure record was merely dicta. In *this* case, we must decide the specific issue preserved and argued: whether the shift-assignment duty rosters containing the names and locations of some correctional-officer posts qualify as infrastructure

10

records. Based on the plain and unambiguous language of R.C. 149.433(B)(2), they do not.

{¶ 22} An infrastructure record is defined as "any record that discloses the configuration of critical systems including, but not limited to, communication, computer, electrical, mechanical, ventilation, water, and plumbing systems, security codes, or the infrastructure or structural configuration of a building." R.C. 149.433(A). The key word in that definition is configuration. To be exempt from disclosure as an "infrastructure record," the document sought must disclose a "configuration" of a critical system.

{¶ 23} The General Assembly did not define the term configuration, but it did say that an infrastructure record "does not mean a simple floor plan that discloses only the spatial relationship of components of the building." *Id.* Therefore, as used in R.C. 149.433(A), for a document to fall within the meaning of the infrastructure-record exception, a document must show an arrangement, layout, or design of a critical system beyond a simple floor plan. Indeed, the shift-assignment duty rosters at issue here do not.

{¶ 24} The rosters are just that—rosters. They are a list of names and correctional-officers posts, some stated in full and some labeled by abbreviations. There is no configuration of correctional-officer posts or the layout, design, or arrangement of correctional-officer posts within the structure of SOCF or its grounds. Therefore, the shift-assignment duty rosters at issue here are public records and not exempt from production as infrastructure records under R.C. 149.433(B)(2). Absent evidence that the redacted material falls within another exception, any redactions are improper. And here, because Greene fails to advance any other argument or submit any evidence to support the redactions he made, those redactions are improper.

*Greene has not demonstrated that the shift-assignment duty rosters are security records or plans for disturbance control*

{¶ 25} If a record "contains information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage," it qualifies as a security record under R.C. 149.433(A)(1) and therefore is not a public record under R.C 149.433(B)(1). Therefore, I agree with the majority that when a record meets the definition of a security record, it is not a public record and is exempt from production. But Greene has not demonstrated that the shift-assignment duty rosters meet the definition of "security records" under R.C. 149.433(A).

{¶ 26} In Greene's letter to McDougald stating his reasons for the redactions, Greene claimed that the redactions were permissible because the records are security records pursuant to R.C. 149.433(A) and (B) and also that the records are " 'plans * * * for disturbance control,' per RC 5120.21(D)(2)." (Ellipsis sic.) Greene's bald assertion contained no statutorily required explanation. In his brief to this court, Greene did not raise R.C. 5120.21(D)(2) at all; therefore, he waived any argument that the shift-assignment duty rosters are plans for disturbance control.

{¶ 27} As far as the security-records exception is concerned, Greene gave it a cursory mention in one line of his merit brief, concentrating instead on the infrastructure-records exception. As set forth above, Greene's sole argument was a single sentence: "Furthermore, by the very definition asserted by the Relator in his Brief, the requested documents constitute a security record pursuant to R.C. 149.433." But, because McDougald's brief contains no definition of security record, this statement is peculiar at best.

{¶ 28} While the majority acknowledges the deficiencies in Greene's brief, it nevertheless rescues him by relying on a "suggestion"—not a holding—from *Rogers*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208. The actual thrust

of this portion of the *Rogers* opinion is that when the government claims an exception to the release of public records, the government must prove the applicability of the exception. But the majority points to an aside that we made in *Rogers* to support its point. In *Rogers*, we said:

> In another recent public-records case, we held that records documenting direct threats against the governor kept by the Department of Public Safety met the definition of "security records" under R.C. 149.433(A). However, we cautioned that the exception must be proved in each case: "This is not to say that all records involving criminal activity in or near a public building or concerning a public office or official are automatically 'security records.' The department and other agencies of state government cannot simply label a criminal or safety record a 'security record' and preclude it from release under the public-records law, without showing that it falls within the definition in R.C. 149.433." [*State ex rel. Plunderbund Media, L.L.C. v. Born*, 141 Ohio St.3d 422, 2014-Ohio-3679, 25 N.E.3d 988,] ¶ 29. And when a public office claims an exception based on risks that are not apparent within the records themselves, the office must provide more than conclusory statements in affidavits to support its claim. *See State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 400-401, 732 N.E.2d 373 (2000).

*Rogers* at ¶ 15.

{¶ 29} In *Rogers*, the point being made was that conclusory statements are not enough to prove an exception to disclosure of a public record. The majority first states that in *Rogers*, this court "suggested" that "a public-records custodian

may meet his burden when the stated exemption upon which he relies is 'based on risks that are * * * apparent within the records themselves,' *Rogers* at ¶ 15." (Ellipsis added in majority opinion.)   Majority opinion at ¶ 10.   But several paragraphs later, the majority opinion turns that suggestion into a rule.  *Id*. at ¶ 13 ("That rule makes sense, especially in this case").

{¶ 30} But taking the "suggestion" language outside the context of *Besser* is disingenuous.  The majority cites no case in which this court has ever held that the applicability of the security-records exception applies when risks are apparent from the face of the records.  Certainly, *Besser* does not stand for that proposition. In *Besser*, the Ohio State University ("OSU") responded to a public-records request and provided some responsive records but withheld others due to the belief that the withheld records were exempt as trade secrets, intellectual-property records, and attorney-client privileged material—a security-records exception was not cited as a reason for withholding the records.  *Id.* at 399.  When the public-records requester challenged OSU's claimed exemptions, OSU made an argument before this court that the records could be withheld because they were either trade secrets or intellectual-property records.  *Id*. at 377-381. We concluded that "OSU's reliance on conclusory affidavit statements is insufficient to satisfy its burden to identify and demonstrate that the records withheld and portions of records redacted are included in categories of protected information under R.C. 1333.61(D)." *Id*. at 404. This court found that of all the documents sought, just two lists of doctors' names were trade secrets.  *Id*. at 402, 404.  Citing a previous decision and a treatise, this court determined that due to the lists at issue in *Besser* being similar to a business' customer lists, the doctors' names were "presumptively" trade secrets, *id*. at 402, but OSU still had to show that it took "measures to prevent [the] disclosure [of the lists] in the ordinary course of business to persons other than those selected by the owner," *id*. at 402.  That the lists were trade secrets was not apparent from the

14

documents themselves, but required additional evidence regarding OSU's treatment of the records.

{¶ 31} Our analysis in *Besser*, 89 Ohio St.3d 396, 732 N.E.2d 373, focused on OSU's failure to satisfy its burden to prove that an exception to disclosure applied. OSU bore the burden of proof, and it failed to carry its burden. But here, in contrast, the majority flips the burden of proof and relieves Greene of having to prove that the security-records exception applies. In *Besser*, OSU at least presented a full argument and an affidavit, albeit conclusory, to support its claim that specific exceptions applied. But that was not enough in that case. Here, Greene has neither made even a partial argument that the security-records exception applies nor has he submitted evidence supporting his single-sentence reference to the security-records exception.

{¶ 32} In his brief before this court, Greene fails to explain why the definition of a security record is applicable to the shift-assignment duty rosters beyond a single sentence. And as recognized by the majority, Greene's affidavit does nothing to further that "argument." Accordingly, this court has no evidence before it as to why the shift-assignment duty rosters are security records. Yet, in contrast to the decisions in *Rogers*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, and *Besser*, in which this court held the public offices to the burden of proof, the majority allows Greene to succeed in asserting a public-records exception, notwithstanding his failure to argue and prove with supporting evidence that the exception applies. The majority turns the burden of proof on its head.

{¶ 33} While the majority's ultimate decision may be well-intended, the unintended consequences of this case, especially its new rule, cannot be overstated. This case eviscerates Ohio's Public Records Act and the burden of proof placed on a public-records custodian to delineate the specific exception that applies and why. This case also holds that a public-records custodian need not specifically argue an

exception before us or produce evidence upon which we must rely to determine whether an exception applies.

{¶ 34} Inherent in the fundamental policy of Ohio's Public Records Act is the promotion of an open government, not a restriction of it. *State ex rel. The Miami Student v. Miami University*, 79 Ohio St.3d 168, 171, 680 N.E.2d 956 (1997). Consistent with this policy is this court's longstanding determination that "[e]xceptions to disclosure must be strictly construed against the public record custodian, and the burden to establish an exception is on the custodian." *State ex rel. McGowan v. Cuyahoga Metro. Hous. Auth.*, 78 Ohio St.3d 518, 519, 678 N.E.2d 1388 (1997).

{¶ 35} Greene needed to do more. A "department * * * of state government cannot simply label a criminal or safety record a 'security record' and preclude it from release under the public-records law, without showing that it falls within the definition of R.C. 149.433." *Plunderbund*, 141 Ohio St.3d 422, 2014-Ohio-3679, 25 N.E.3d 988, at ¶ 29. Greene fails to provide any substantive reason or explanation why the security-records exception should apply. Greene did not even name which of the three categories of security records listed in R.C. 149.433(A) the redacted material fits into—i.e., security of a public office, R.C. 149.433(A)(1), preventing terrorism (which also includes three additional subcategories of security records), R.C. 149.433(A)(2)(a), (b), or (c), or emergency management, R.C. 149.433(A)(3).

{¶ 36} The majority selects a rationale for Greene, deciding that the records requested contained "information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage" under R.C. 149.433(A)(1), and it then presents its own evidence to support it. The majority says that the rosters have *relevance* to the security of the prison—however, the word "relevance," majority opinion at ¶ 10, does not appear in R.C. 149.433(A)(1) and therefore relevance to security does not establish that the security-records

exception applies. And although the majority focuses on how "this is information that could be used to plan an escape or an attack on the prison or to aid in the smuggling in of contraband," majority opinion at ¶ 9, the applicability of R.C. 149.433(A)(1) turns on a factual question regarding how the shift-assignment duty rosters are directly used *by the prison*, not on how the rosters could be put to use by third parties. We cannot assume that those records are *directly used* for maintaining security when Greene himself has not bothered to make that argument or submit any proof of it.

**{¶ 37}** The majority suggests that McDougald did not raise the issue of Greene's failure to meet his obligation under R.C. 149.43(B)(3) to "provide the requester with an explanation, including legal authority, setting forth why the request was denied." But McDougald sufficiently raised the issue when he argued that "a department of state government cannot simply lab[el] a record a security record within the meaning of R.C. 149.433 and R.C. 5120.21(D) without showing that it falls within an express provision of the statu[te]." In the end, the majority just ignores the language of R.C. 149.43(B)(3) requiring the public office or person responsible for the requested public record to provide an explanation for the denial of a public-records request. And the public-records custodian has the burden of proving that the requested records "fall squarely within [an] exception." *Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, at ¶ 10. Greene simply has not done that, and the Public Records Act does not give this court the authority to do it for him.

**{¶ 38}** Therefore, I would fully grant McDougald a writ of mandamus and order Greene to provide him with unredacted copies of the shift-assignment duty rosters from March 7, 2019.

*Statutory damages*

**{¶ 39}** I would hold that McDougald meets the initial statutory criteria for an award of statutory damages but that he should not ultimately receive any

statutory damages. To be eligible for an award of statutory damages, the requester must transmit the public-records request by "hand delivery, electronic submission, or certified mail." R.C. 149.43(C)(2).[2] "Hand delivery" is not defined in the statute. Greene admits that he received McDougald's request through the prison's kite system. "A 'kite' is written by an inmate to a member of the prison staff and is 'a means for inmates to contact staff members inside [an] institution.' " *State ex rel. Martin v. Greene*, 156 Ohio St.3d 482, 2019-Ohio-1827, 129 N.E.3d 419, ¶ 3, fn. 1, quoting *State v. Elmore*, 5th Dist. Richland No. 16CA52, 2017-Ohio-1472, ¶ 15. Because I would hold that a public-records request made by kite constitutes hand delivery, I would hold that McDougald is eligible to receive statutory damages. *See State ex rel. McDougald v. Greene*, ___ Ohio St.3d. ___, 2020-Ohio-3686, ___ N.E.3d ___, ¶ 60 (Kennedy, J., dissenting).

{¶ 40} Although McDougald is eligible to receive an award of statutory damages because he transmitted his request by hand delivery, that does not end the inquiry. Pursuant to R.C. 149.43(C)(2), a person who makes a public-records request "shall be entitled to recover * * * statutory damages * * * if a court determines that the public office or the person responsible for public records failed to comply with an obligation in accordance with" R.C. 149.43(B). R.C. 149.43(B)(3) provides that "[i]f a request is ultimately denied, in part or in whole, the public office or the person responsible for the requested public record shall provide the requester with an explanation, including legal authority, setting forth why the request was denied." A records custodian bears the burden of establishing the applicability of an exception to R.C. 149.43 and "must prove that the requested records 'fall squarely within the exception.' " *Rogers*, 155 Ohio St.3d 545, 2018-

---

2. Public-records requests are governed by the version of R.C. 149.43 that was in effect at the time that the request was made. *State ex rel. Cordell v. Paden*, 156 Ohio St.3d 394, 2019-Ohio-1216, 128 N.E.3d 179, ¶ 11. The version of the Public Records Act that governs McDougald's requests, R.C. 149.43 as amended by 2018 Sub.H.B. No. 312, took effect in November 2018.

Ohio-5111, 122 N.E.3d 1208, at ¶ 7, quoting *Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, at ¶ 10.

{¶ 41} A redaction is considered a denial as to the redacted information. R.C. 149.43(B)(1).  Here, Greene denied McDougald's public-records request by heavily redacting the shift-assignment duty rosters.  After the redactions, the only information that remained was the page headings, date, and shift-supervisor signature lines.  Because Greene fails to meet his burden of proving that the redacted material falls within any of the exceptions he relied upon to redact the information, he failed to comply with the requirements of R.C. 149.43(B)(3). Therefore, McDougald qualifies for an award of statutory damages.

{¶ 42} Statutory damages are calculated at the rate of $100 "for each business day during which the public office or person responsible for the requested public records failed" to comply with an obligation under R.C. 149.43(B), starting from the date on which the requester filed a complaint for a writ of mandamus, with a maximum award of $1,000.  R.C. 149.43(C)(2).

{¶ 43} However, a court may reduce or decline to award statutory damages if it finds that based on the law as it existed at the time the public office allegedly failed to comply with R.C. 149.43, "a well-informed public office or person responsible for the requested public records reasonably would believe that the conduct * * * did not constitute a failure to comply * * * with [R.C. 149.43(B)]," R.C. 149.43(C)(2)(a), and that a "well-informed public office or person responsible for the requested public records reasonably would believe that the [redaction] * * * would serve the public policy that underlies the authority that is asserted," R.C. 149.43(C)(2)(b).

{¶ 44} Based on those reduction factors, I would deny McDougald's request for statutory damages because a well-informed person responsible for the requested public records here could have reasonably believed that the shift-assignment duty rosters qualify as security records under R.C. 149.433(A)(1) and

are therefore not public records, satisfying R.C. 149.43(C)(2)(a). Further, a well-informed person responsible for the requested public records would believe that withholding the records would serve the public policy behind the security-records exception, satisfying R.C. 149.43(C)(2)(b).

*Conclusion*

{¶ 45} Through a linguistic sleight of hand, the majority creates a "suggestion" from one of our cases and converts it into a new "rule" not found in Ohio's Public Records Act that an exception to the disclosure of a public record might apply based on perceived risks of how a requester might use the information in the record. But that new "rule" runs contrary to the plain language of R.C. 149.43(B)(3), which places the burden on the public-records custodian to justify the denial of a public-records request in all cases. The majority's holding therefore encourages public offices to deny public-records requests without sufficient information explaining why a statutory exception applies, and Greene is permitted to prevail, even though he has not complied with his statutory obligation to "provide the requester with an explanation, including legal authority, setting forth why the request was denied," R.C. 149.43(B)(3).

{¶ 46} But more distressing, the majority abandons its "role of neutral arbiter of matters the parties present," *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), by injecting new arguments into this case and relying on "evidence" that does not exist. " 'The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them.' " *Natl. Aeronautics & Space Administration v. Nelson*, 562 U.S. 134, 147, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011), fn. 10, quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983). As Judge Richard Posner once explained, "we cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor. That's not how an

adversarial system of adjudication works." *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir.2013).

{¶ 47} Yet here, the majority willingly accepts the roles of being an evidentiary witness, advocate, and judge in providing an explanation for Greene's redactions and purporting to prove the validity of those redactions using its own evidence to decide how McDougald could use the information in the shift-assignment duty rosters. That argument and evidence, by itself, is insufficient, because the security-record exception would apply in this case only if SOCF actually uses the information in the shift-assignment duty rosters to protect or maintain the security of its facilities. Because Greene failed to argue and present evidence to prove that shift-assignment duty rosters fit squarely within that exception or any other, I would order Greene to provide unredacted copies of the shift-assignment duty rosters to McDougald. But I would not award McDougald statutory damages.

––––––––––––––––––

Jerone McDougald, pro se.

Dave Yost, Attorney General, and Jared S. Yee, Assistant Attorney General, for respondent.

––––––––––––––––––